# HAWAII TEAMSTERS and ALLIED WORKERS
## LOCAL 996
## OAHU TRANSIT SERVICES, Inc.



# AGREEMENT



## Operating and Maintenance Employees
## July 1, 2008 – June 30, 2013



**City and County of Honolulu**

**EXHIBIT** 1

# AGREEMENT

THIS AGREEMENT made and entered into by and between Oahu Transit Services, Inc., its successors and assigns, hereinafter called the "Company" and the Hawaii Teamsters & Allied Workers, Local 996, its successors and assigns, hereinafter called the "Union," resolves all matters and subjects of collective bargaining for the term hereof.

Section 1.   <u>Employees Covered</u>.

1.1   This Agreement shall cover all employees of the Company contained in the bargaining units as determined by the National Labor Relations Board in Cases 37-RC-31 and 37-RC-125; namely, all operating and maintenance employees, supervisors, dispatchers, instructors, and working foremen, excluding, however, the chief transportation supervisor, chief dispatcher, chief instructor, confidential employees, professional employees, guards, superintendents or department heads and their assistants, supervisors as defined in Section 2 (11) of the National Labor Relations Act, as amended, and other employees covered by other collective bargaining agreements.

1.2   <u>Nonbargaining Unit Personnel</u>.  In the administration of this Agreement, the Company will endeavor to promote the utilization of personnel covered under this Agreement in the performance of work ordinarily, historically, and customarily performed by bargaining unit employees.  Nonbargaining unit personnel will not generally perform bargaining unit work except in emergency situations, where such action is taken to promote safety or avoid damage and/or injury, or where such duties are incidental to the performance of a supervisor's usual duties.

Section 2.   <u>Union Recognition</u>.

2.1   The Company fully recognizes as provided by law the rights of the employees covered by this Agreement and recognizes the Union as the sole and exclusive collective bargaining agent for all of the employees covered by this Agreement.

2.2   The Company further recognizes the rights and obligations to administer this Agreement on behalf of all covered employees.

2.3   The Company recognizes the right of the Union to be present at the adjustment of any grievance arising under this Agreement.  The Company shall notify the Union promptly of any grievance filed in writing or at Step 2 of the grievance procedure in any event and shall provide an opportunity for a union observer to be present at the adjustment of said grievance.

2.4   The Company agrees that it will give each new employee in the bargaining unit a copy of this Agreement together with a statement calling the attention of each new employee to the fact that Local 996, Hawaii Teamsters & Allied Workers,

has been legally recognized as the sole collective bargaining agent for all employees in the bargaining unit.

Section 3.    Union Security.

3.1    As a condition of employment, after thirty (30) days from the effective date of this Agreement or after thirty (30) days from the date an employee is hired, whichever is later, all employees covered by this Agreement shall be required to become and remain members of the Union in good standing.

3.2    If an employee fails or refuses to pay or tender dues to the Union by the 10th day of each month and the Union notifies the Employer in writing of such failure or refusal, then such employee shall be discharged unless the dues are paid within ten (10) calendar days after the Employer receives the notice.

Section 4.    Notification.

4.1    The Company will notify the Union of all hiring, terminations from the payroll, and promotions, together with the reason for any termination.

Section 5.    Non-Discrimination & Equal Employment Opportunity.

5.1    The parties agree that all employees will be free of unlawful harassment, discrimination, or illegal employment practices.  In accordance with the policies of the Company and of the Union, it is agreed that neither party will discriminate against any employee on the basis of any status or factor protected by State of Hawaii or federal law, as amended.

5.2    Accommodation of Employees with Disabilities.  Notwithstanding the seniority provisions of this Agreement, it is the intention of the Company and the Union that employees who because of a disability are unable to handle their regular work to advantage will be given preference as to such work, if available, as they are able to do and shall carry their full accumulated seniority to the new job.  The wages, hours, terms, and conditions of employment of such employees shall be discussed and agreed upon by the Company and the Union, subject to Section 16, New or Changed Jobs.

Section 6.    Bulletin Boards.

6.1    The Company will provide six (6) bulletin boards conveniently located for the exclusive use of the Union, including one in each locker room of the garage and shop departments.

6.2    The Union shall not put any document on such bulletin boards containing scurrilous language or language derogatory to the Company or its employees.

Section 7.    Deductions from Wages.

7.1    The Company agrees to deduct from the wages of each of its employees as shall so request in writing an initiation fee, monthly dues, and not more than $2.00 per month as assessments, as certified in writing by the Union. Employees desiring to have their union dues deducted may voluntarily sign the proper form, attached hereto, marked Exhibit "B" and made a part of this Agreement, requesting such deduction which will, upon filing with the Company, be honored in accordance with its terms. Such deductions shall not be made more often than once a month. In requesting deductions for assessments, the Union shall restrict such requests to assessments levied on all members of the Union on a uniform basis as an incident of membership in the Union.

7.2    In case any employee does not have the total amount of any deduction or more due him on any payroll from which deductions are made in respect to other such employees, the deduction shall be made out of the next payroll from which such deductions are made and upon which such employee has the total amount or more due. It is agreed that authorized deductions for government taxes and for the purpose of paying indebtedness to the Company, garnishments, and deductions required by law to be made by the Company shall have priority over deductions made for union dues.

7.3    The total amount of any such deductions shall be promptly transmitted by the Company to the Union by check drawn to the order of Hawaii Teamsters & Allied Workers, Local 996. Upon the issuance of such check and transmission of same to the Union, all responsibility on the part of the Company shall cease with respect to any amounts so deducted. The Company shall not be bound in any manner to see to the application of the proceeds of any such check or to investigate the authority of any designated officer of said Union to sign any request to accept any such check or to collect the same. The Union hereby undertakes to indemnify and hold blameless the Company from any claim that may be made upon it for or on account of any such deduction for initiation fees, dues, or assessments from the wages of any employees.

Section 8.    Continuous and Uninterrupted Service.

8.1    The parties hereto agree that during the term of this Agreement, there shall be no lockout by the Company, nor any strike, sit-down, refusal to work, stoppage of work, slow-down, retardation of production, or picketing of the Company on the part of the Union or its representatives or on the part of any employee covered by the terms of the Agreement.

Section 9.    Grievances and Grievance Procedures.

9.1    A grievance is hereby defined as a violation or an alleged violation of any of the provisions of this Agreement on the part of the Company or any of its officers or employees, or in the case of an individual employee, unjust disciplinary action or improper treatment. A misunderstanding of the meaning of any section of this Agreement shall also be considered a grievance.

9.2    An employee covered by this Agreement shall have the right to be represented by the Union before the proper officials of the Company and to produce witnesses on the employee's behalf as to the justice of the discipline imposed; and if found correct, such employee shall be paid such lost wages as the employee would have received had the employee been permitted to work and shall be reinstated to the employee's former position with full pay, and all detrimental marks pertaining to the alleged offense shall be expunged from the employee's record.

9.3    If a grievance is alleged by an employee or the Union on behalf of the individual employee, the following grievance procedure shall be followed:

9.3.1    Step 1.    The grievance shall be presented in writing to the Vice President of the department affected (or the Vice President's designee) within ten (10) working days of the occurrence of the alleged grievance.  Within seven (7) working days following receipt of the grievance, the Vice President of the department (or Vice President's designee) shall issue a written response.  If the response of the Vice President does not adjust the grievance to the satisfaction of the grievant, and the grievant or the Union desires to proceed further, the grievance shall be processed in accordance with Step 2.

9.3.2    Step 2.    If the grievance has not been resolved at Step 1, the Union and/or the grievant shall present the grievance within five (5) working days to the President of the Company (or the President's designee).  Within five (5) working days following receipt of the grievance (exclusive of Saturdays, Sundays, and holidays), the President of the Company (or the President's designee) shall issue a written response. If the response of the President of the Company does not adjust the grievance to the satisfaction of the grievant, and/or the Union and the grievant or the Union desire to proceed further, a written demand for arbitration may be made in accordance with procedures set forth under Step 3.

9.3.3    Step 3.    Within ten (10) working days (exclusive of Saturdays, Sundays, and holidays) following conclusion of Step 2, the grievant or the Union may make a demand for arbitration of the grievance (excluding grievances subject to timely job security procedures).

9.3.4    Such demand must be presented in writing to the Company, setting forth the section(s) of the Agreement involved and the relief sought.

Section 10.    Arbitration of Grievances.

10.1    During the period of this Agreement, Thomas Angelo, Joyce Najita, Louis Zigman, Bonnie Castrey, Walter Ikeda, Dan Bent, John McConnell, Patrick Yim, Michael Marr, Michael Nauyokas, and Charles Bocken are hereby selected as a panel of arbitrators.

10.2    Within seven (7) calendar days following a demand for arbitration, the Company and the Union shall by fax, phone, meeting, or otherwise, alternately strike one (1) name from the panel of arbitrators until one (1) name remains to serve for that

- 4 -

case. The right to strike the first name shall be determined by the flip of a coin. The Company and/or the Union shall immediately contact the selected arbitrator by facsimile or telephone to request available dates to hear the pending matter. In the event the selected arbitrator cannot serve within forty-five (45) calendar days from notification, the parties shall proceed to select another arbitrator in accordance with the procedure hereinabove stated. The arbitrator shall have no power to alter, amend, nullify, modify, add to, or subtract from the express terms of this Agreement.

10.3    The arbitrator is to receive reasonable compensation for services performed. The compensation must be acceptable by the arbitrator and mutually agreed upon by the several parties participating in the proceedings. All fees and expenses of the arbitrator shall be borne equally by the Union and the Company provided, however, that the arbitrator shall bear all costs of travel, lodging, and meals, if any, and the arbitrator's fees shall not exceed One Thousand Dollars ($1,000) per hearing day, and Twenty-five Hundred Dollars ($2,500) in the aggregate for study and writing the opinion and award, absent other mutual agreement of the parties. Each party to the proceeding shall bear the expense of the presentation of its own case and its share of other expenses.

10.4    The parties will endeavor where possible to use expedited services of a reputable court reporter service, which agrees to provide copies of the transcripts to each party including the arbitrator, within seven (7) calendar days of the close of hearing, at an aggregate fixed fee not to exceed Six Dollars and Fifty Cents ($6.50) per page. In the event expedited court reporter services at the fixed fee described herein are unavailable for any reason, either party may elect to use alternate court reporter services.

10.5    The arbitrator shall make a decision, which shall be final and binding on all participants, in light of the whole record and shall decide the case upon the weight of all substantial evidence presented. The decision and award of the arbitrator shall include findings of fact and conclusion of law. All decisions of the arbitrator shall be in writing and a copy thereof shall be submitted to each of the parties. The arbitrator following receipt of post-hearing briefs will normally render and distribute the written opinion and award within thirty (30) calendar days.

10.6    If the alleged grievance involves disciplinary action in the nature of assignment to the extra list, such disciplinary action shall be stayed by the timely institution of grievance proceedings and of proceedings before the arbitrator pursuant to the terms of this contract.

10.7    Expedited Arbitration.

10.7.1    The parties by mutual agreement may submit pending grievances involving minor discipline and suspensions of less than eleven (11) days to an Expedited Case Arbitrator who shall promptly convene a hearing under the informal arbitration procedure with the understanding that there may be multiple cases in a day.

10.7.2      Each party will present its case orally without the presence of legal counsel, court reporter services, or written post hearing briefs. Witnesses may be called by the parties, subject to forty-eight (48) hours' notice to the Arbitrator, or as required by the parties. The Expedited Case Arbitrator shall submit the decision and the basis for his/her decision in writing to the parties within ten (10) working days following close of hearing. The written decision of the Expedited Case Arbitrator need not comment on the evidence nor set forth a statement of reasons there for. The award shall be final and binding as to the dispute present but without precedent as to the administration of this Agreement.

10.7.3      The Expedited Case Arbitrator shall be Joyce Najita, the first alternate shall be Michael Nauyokas, and the second alternate shall be Walter Ikeda. These appointments shall rotate on each anniversary date of this Agreement.

10.7.4      The Expedited Case Arbitrator shall have the authority to resolve any dispute or issue that is properly before him/her under this Agreement, except matters that have been referred to formal arbitration. The Expedited Case Arbitrator shall have no power to alter, amend, nullify, modify, add to, or subtract from the express terms of this Agreement.

Section 11.   <u>Management Rights.</u>

Except as limited by the express terms of this Agreement, the Company retains its residual rights, including its rights to:

    (a)   direct and assign work;
    (b)   hire, fire, promote, transfer employees;
    (c)   discipline employees for just cause;
    (d)   take all proper actions appropriate to carry out the business of the Company.

Section 12.   <u>Job Security Committee.</u>

12.1   In order to provide job security, a Job Security Committee shall be formed. The Committee will consist of three (3) members appointed by the Company and three (3) members appointed by the Union. It shall be the responsibility of this Committee to pass upon all matters pertaining to disciplinary action involving suspensions pending dismissal of a regular employee.

12.2   Any regular employee who by reason of disciplinary action is subject to discharge will be suspended pending dismissal and will be followed by a thorough review of all pertinent information by the Job Security Committee. The Union will be notified in writing as soon as possible when an employee is suspended pending dismissal. The Union within forty-eight (48) hours (exclusive of Saturdays, Sundays, and holidays) after receipt of said notification will advise the Company of its demand to convene the Committee to review the matter. If such demand is not timely delivered, the Job Security Committee procedure shall not be applicable provided that, if this

Section 12 is not timely invoked, the matter may be processed in timely fashion under Section 9.

12.3   The demand for a meeting of the committee will be accompanied by a written statement of the individual concerned, requesting that the employee's case be reviewed by the Committee and the specific relief sought.

12.4   Upon receipt of the demand notice, said Committee shall convene at a mutually agreeable time, but in any event, within forty-five (45) calendar days from the time such notice is received by the Company. If, however, the Union does not present this matter before the Committee within the forty-five (45) calendar days described herein, such matter shall be deemed to be waived.

12.5   In the event of a deadlock, the Union or the grievant shall be permitted to make a demand for arbitration within seven (7) calendar days from the date of the deadlock.   Thereafter, the matter shall be controlled by the provisions of Section 10, Arbitration of Grievances.

12.6   A majority decision of the Committee as to discharge or other disciplinary action shall be final and binding upon all parties.

12.7   Each party to this Agreement shall pay the expense of its own committee members.

Section 13.   Time Limitations.

13.1   All time limits are of the essence of this Agreement.  No extension of time limits shall be binding on either party without the approval and signature of the Company's President and the President of the Union or some other individual authorized in writing to so act.

13.2   In order to ensure compliance by both the Union and the Company to the time limitations set forth in this Agreement, the parties agree that a failure by either party to comply with the time limits in any step of a grievance process shall be considered a waiver of that party's position in the grievance, and the grievance shall be considered adjusted in favor of the party that did not fail to so comply with the applicable time limit.

Section 14.   Disciplinary Record.

14.1   All records of any disciplinary actions, including warnings, complaints, suspensions, and accidents shall be removed from an employee's personnel file and shall not be considered for any purpose after three (3) years from the date of the incident.

Section 15.   <u>Wages</u>.

15.1   Attached hereto, marked Exhibit "A," and made a part of this Agreement is the wage schedule setting forth the wage rates which shall apply for the term of this Agreement.

Section 16.   <u>New or Changed Job</u>.

16.1   When the employer establishes a new job classification or substantially changes the duties of an existing position, it shall provide the Union with the job description, a statement of working conditions, and the proposed level of compensation. The Union and Company shall negotiate for up to 30 days, and absent agreement, Union and Company will directly submit the matter to formal arbitration.  Any agreement between the parties on any award of an arbitrator shall be retroactive to the date of placement, and placement of the employee shall not be delayed.

Section 17.   <u>Hours and Overtime</u>.

17.1   All hourly employees shall be paid at one and one-half (1 1/2) their regular straight-time rate for work which is defined hereinafter as overtime provided, however, that under no circumstances will one and one half (1 1/2) or premium time of any kind be paid more than once for the same hours.

17.2   Overtime is hereby defined as follows:

17.2.1   <u>For Operators</u>:  All hours worked in excess of eight (8) hours in the twenty-four (24) hour period from 3:00 a.m. to 3:00 a.m., exclusive of meal periods or all hours worked in excess of forty (40) straight-time hours in one (1) week.

17.2.2   <u>For Maintenance Employees on the Night Shift (between 3:30 p.m. and 7:00 a.m.)</u>:  All hours worked in excess of eight (8) consecutive hours including a meal period of one-half (1/2) hour's duration or all hours worked in excess of forty (40) straight-time hours in one (1) week.

17.2.3   <u>For All Other Employees</u>:  All hours worked in excess of eight (8) consecutive hours exclusive of meal periods or all hours worked in excess of forty (40) straight-time hours in one (1) week.

17.2.4   <u>Distribution of Overtime</u>:  Employees regularly assigned to a classification within each department shall be offered the first opportunity to work overtime within their classification before said overtime is made available to employees temporarily classified in the same classification.

17.3   <u>Days Off</u>.  During the term of this Agreement, operators will be given two (2) consecutive days off in any seven (7) day period during each sign-up.  After a new sign-up occurs, the days off shall be the days off scheduled on the new sign-up, but any operator who is required by reason of the new sign-up to work on the sixth (6th) or

- 8 -

seventh (7th) consecutive day shall be paid at one and one-half (1 1/2) the employee's regular straight-time rate of pay for all work performed on that day.

17.4   All other employees covered by this Agreement will be given two (2) consecutive days off in any seven (7) day period.

17.5   When the Company cancels an hourly employee's scheduled day (or days) off or requires such employee to work on a day (or days) off, the Company will pay time and one-half (1 1/2) for such time worked, provided such an employee shall be guaranteed the equivalent of at least eight (8) hours' pay at the regular rate of pay for the time so worked.

17.6   Upon submission of a written request, employees will, at the discretion of the proper company official, exchange days off without the payment of overtime.

Section 18.   Holidays.

18.1   The following holidays will be observed:

| | |
|---|---|
| New Year's Day | Admission Day |
| Martin Luther King Jr. Day | Labor Day |
| Presidents' Day | Veterans' Day |
| Kuhio Day | Thanksgiving Day |
| Good Friday | Christmas Day |
| Memorial Day | Election Day |
| Kamehameha Day | (excluding Primary Election) |
| Independence Day | |

Bus Operators Only
Beginning March 1, 2009, bus operators have the option to replace one (1) designated State holiday with a guarantee day-off on their birthday. This provision will sunset on February 28, 2010, unless the Company and the Union agree to an extension.

For purposes of this Section, designated State holidays are:  Kuhio Day, Good Friday, Kamehameha Day, and Admission Day.

18.2   Holidays shall, for the purpose of this Agreement, be the days on which the above-named days are celebrated by the City and County of Honolulu.

18.3   If a holiday falls on an employee's nonscheduled working day, the next workday becomes the holiday.

18.4   If a holiday falls during an employee's vacation, the employee shall receive an extra workday off with pay.

18.5   An hourly employee who would otherwise lose compensation because of said holidays shall receive eight (8) hours' pay at the regular straight-time rate.

18.6    Holidays as listed in this Agreement will be considered as days worked for the purpose of computing weekly overtime.  All work performed on shifts which start on said holidays, whether regular time, overtime, or spread time, shall be compensated for at twice the employee's regular straight-time rate of pay.

Section 19.  <u>Vacations</u>.

19.1.1    Employees hired before July 1, 1997, who on or before the first day of March of any year have completed one (1) year of service shall be entitled to twenty-one (21) working days of paid vacation per year with pay computed on the basis of one hundred and sixty-eight (168) hours at their regular straight-time rate of pay. Such employees who on the first day of March have not completed one year of service shall be entitled to one and three-quarters (1-3/4) days paid vacation, computed on the basis of eight (8) hours per day at their regular straight-time rate of pay for every month in the preceding twelve (12) month period for which compensation is paid.

Employees hired on or after July 1, 1997, shall receive vacation pay in accordance with the following schedule:

| Years | Vacation Days |
| --- | --- |
| 1-5 | 15 |
| 6-29 | 21 |

Such employees who on the first day of March have not completed one year of service shall be entitled to one and one-fourth (1 1/4) days paid vacation, computed on the basis of eight (8) hours per day at their regular straight-time rate of pay for every month in the preceding twelve (12) month period for which compensation is paid.

19.1.2    All employees who have completed thirty (30) years of service shall receive twenty-five (25) days of vacation pay per year with pay computed on the basis of two hundred (200) hours at their regular straight-time rate of pay for vacations taken after March 1, 1998.

19.2    All employees who are entitled to vacations shall sign for such vacation on the basis of company seniority prior to March 1 of each year. The Company shall, on a trial basis and consistent with company efficiency, offer employees the option to split their vacations into two periods.  In the event the Company is unable to schedule all such vacation days through the normal vacation sign-up process due to scheduling difficulties and employees' schedule days off, the Company, at its option, may allow the employee to add the remaining days to the end of a vacation period or pay the employee for vacation days lost.

19.3    "Continuous service" in this section refers to uninterrupted employment. All continuous absences, with the exception of military leave and jury duty, of four (4) months or more interrupts employment.  The employee's vacation for the year concerned shall be reduced in the proportion that the length of such leave of absence bears to one (1) year.

19.4    Any employee dropped from the service of the Company who has completed twelve (12) months of continuous service or has completed twelve (12) consecutive months of continuous service since the anniversary of the employee's employment and who has not had vacation for that year will be given vacation pay.

19.5    Flexible Vacation Days.  Effective for vacations scheduled after March 1, 1997, employees may defer up to four (4) vacation days as flexible vacation.  These days can be carried over into the next vacation year but no more than four (4) days may be carried over per year.  During the year, employees can request single or multiple days off for personal or family reasons from the deferred vacation days, if any, by submitting a special vacation request to the employee's supervisor at least one (1) week in advance of the date(s) requested.  Vacation requests for personal or family reasons received less than one (1) week in advance will be considered emergency vacation and will be granted for good reason.

19.6    Vacation Sell Back.  The Company, at its sole discretion, may allow an employee to "sell back" up to two (2) weeks of vacation.

Section 20.    Sick Leave and Accident Compensation.

20.1    When an employee reports off sick, the employee shall be on the sick list until reporting back for work or until such time as it is determined that the employee's status is not correctly that of "sick list."  Such employee must report back for duty before 11:00 a.m. on the day preceding that on which the employee expects to work.

20.2    Any employee covered by this Agreement who has been in the employ of the Company for at least six (6) months and who because of accident not covered by the State of Hawaii workers' compensation law, sickness, or disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom, is prevented from working will be entitled to twelve (12) working days sick leave with pay computed on the basis of the employee's then current straight-time rate of pay.  Thereafter, on March 1 of each year, each employee will be entitled to an additional twelve (12) days sick leave with pay for the period March 1 through February 28, except that an employee who has completed five (5) years of service on March 1 of each year shall be entitled to fifteen (15) days sick leave instead of twelve (12) days from the period March 1 though February 28.

20.2.1    Sick benefits for hourly employees, operators, and mechanic personnel, shall begin on the first scheduled work day, except that those employees who accumulate more than six (6) occurrences of absence in the previous 12 months, measured quarterly, shall have sick leave benefits on the second scheduled work day that the employee is absent because of disability.  Quarterly measurement of absence occurrences shall commence on December 1, 1997.  Once an employee has accumulated more than six (6) occurrences of absences within a twelve (12) month period, the employee will not be eligible for sick pay on the first day until the next quarterly evaluation shows six (6) or fewer occurrences in the previous rolling twelve (12) months.  As used in this Section 20, sick leave absence includes both paid and

unpaid sick days. It is expressly understood that the six (6) occurrences in twelve (12) months applies only for the purposes of a first day sick leave policy.

20.3   Proration. Sick leave credit is accumulated based on compensable hours earned. Full sick leave credit shall be afforded to all employees who have four (4) months or less of cumulative unpaid absence during the prior twelve (12) months. Should an employee accumulate in excess of four (4) months of unpaid absence in the previous year, sick leave credit shall be reduced in proportion that the length of such unpaid absence bears to one (1) year.

20.4   Any salaried paid employees covered under this Agreement shall be excluded from the restriction set forth under Section 20.2.1., and will continue to receive sick leave pay from the first day of absence.

20.5   The Company may require that all illnesses, when sick leave pay is involved, be attested to by a certificate from a medical or dental practitioner licensed to practice under the laws of the State of Hawaii, except that the requirement to present a medical certificate shall be waived for absences of less than three days for employees who have accumulated fewer than four occurrences of absence in the previous twelve (12) month period, measured quarterly, effective March 1, 1997.

20.5.1   Based upon just cause or reasonable suspicion, the Company shall have the right to subject any employee to examination by the company physician, who may render a medical opinion regarding the physical condition of any employee at any time. Such examination shall be at the Company's expense.

20.6   Any employee who submits a fraudulent sickness report or falsifies a report will be rejected for the sickness benefit payment for the period in which payment is being requested. Where a fraudulent or falsified sickness report is made, the employee will be subject to disciplinary action up to and including discharge.

20.7   Employees applying for statutory TDI benefits must first exhaust their regular sick leave benefits.

20.8   Employees with at least one year's service may elect to redeem fifty percent (50%) of their unused annual sick leave allowance. Employees electing to redeem their unused annual leave must apply to the Company each year on a form provided by the Company. Sick leave redeemed may be received in cash or credited to an employee's deferred compensation plan. There shall be no cash out of sick leave benefits for employees who cease employment during the benefit year (March 1 through February 28); provided that nothing herein shall affect rights to retirement and layoff credit for accumulated sick leave.

20.8.1   Annual sick leave not redeemed shall be added to the employee's cumulative allowance. Sick leave shall be cumulative from year to year with no maximum.

20.9   <u>Employees on Disability Leave</u>.

20.9.1      Employees on disability leave will be afforded a non-debited day of sick leave when the period of absence encompasses a holiday as defined in Section 18, Holidays, of the current Agreement.

20.9.2      The Company's absence record will show a continual week of sick leave for the employee, but the employee will be charged only four (4) days (from his or her sick leave accrual).

<u>Example</u>:  Employee reports sick for the period July 1 to July 5.  The employee would be charged four (4) days of sick leave from the accrued balance, and one (1) day of holiday pay for July 4.

20.9.3      If an employee is scheduled to work on a holiday and calls in sick for that day, the employee's absence record will be charged sick leave and shown as an occurrence; however, no sick leave day will be deducted from the employee's sick leave accrual.

20.9.4      Employees on an unpaid leave, absence, suspension, TDI, LTDI, or workers' compensation injury status are not covered by the above and shall not receive holiday pay.

20.10   <u>Industrial Accidents</u>.

20.10.1      An hourly employee injured in the performance of duty while in the employ of the Company shall be entitled to the following compensation:

20.10.2      If the disability is permanent, whether total or partial, the employee shall be paid compensation in accordance with Hawaii's Workers' Compensation Act.

20.10.3      If the disability is temporary, whether total or partial, the employee shall be paid two-thirds (2/3) of his/her wages per week with regard for the maximum weekly limitations set forth in the Workers' Compensation Act, but the maximum total compensation provisions of said Act shall be observed.

20.10.4      Permanent and temporary workers' compensation benefits shall not be less than specified in this section and under applicable state law.

20.10.5   <u>The Teamster-OTS Injured Worker Program</u>.

20.10.5.1      The parties agree to establish the Teamster-OTS Injured Worker Program to administer the provision of workers' compensation benefits to injured employees.  The basic objective of this program shall be to provide prompt, quality medical care for injured workers, and returning the injured worker to productive work as soon as it is safe and practicable.  The Program is also intended to reduce the obstacles and delays associated with the present state workers' compensation system

- 13 -

and to reduce the overall cost of workers' compensation to the Employer without reducing benefits to injured workers.

20.10.5.2    The parties agree to engage the services of Benefit Plan Solutions to develop the plan and structure of the Teamster-OTS Injured Worker Program.  The recommended program must be approved by both the President of the Union and the President of Oahu Transit Services.  The plan must also be submitted to the Director of Labor, State of Hawaii, for regulatory approval.

20.10.5.3    The parties agree to share in the professional expenses incurred to set up the program.  The portion of the total expenses to be paid by the Employer shall be eighty percent (80%) of the total fees; the portion to be paid by the Union shall be twenty percent (20%) of total fees.  Legal and other professional fees for reviewing this program plan that are commissioned by either party independently shall be borne by the party commissioning the review.

20.10.5.4    The co-consultants shall present their draft proposal(s) to the parties within sixty (60) days following the ratification of this Agreement.  In the event that disputes between the parties arise regarding the program plan or some portion of the plan, such disputes shall be submitted to binding, final offer arbitration by a neutral arbitrator.  The parties may agree to an arbitrator or choose an arbitrator from the panel of arbitrators specified in Section 10.1.  The applicable procedures specified in Section 10 shall apply unless expressly modified by agreement of the parties.  The arbitrator's decision and award shall be issued within thirty (30) days of submission of the matter to the arbitrator.

20.10.5.5    The Teamster-OTS Injured Worker Program shall be administered by a Labor-Management Joint Board, which shall consist of three (3) members from the Union and three (3) members from the Employer.  The Joint Board shall have the final authority over program administration and general policy.  There shall be established an arbitration or other dispute resolution system acceptable to the parties in the event that the Joint Board vote deadlocks on matters within its jurisdiction.

20.10.5.6    The parties mutually agree that the Teamster-OTS Injured Worker Program shall be perpetual.  However, either party may elect to terminate the program with ninety (90) days' notice.

20.10.5.7    Having been approved by the Director of the State of Hawaii, Department of Labor and Industrial Relations, the aforesaid program shall supersede the provisions hereof to the extent it may be inconsistent therewith.  If said program is terminated, then any superseded provisions shall again be operative.

20.11    Long-Term Disability Insurance.

20.11.1 The Company shall pay for a long-term disability insurance policy, which provides at least the equivalent of statutory TDI benefits for an additional one year of continuing nonoccupational disability following exhaustion of the twenty-six (26) weeks of statutory TDI benefits.

Section 21.    New or Promoted Employees.

21.1    All new employees will be required to serve a six (6) months' probationary period before being considered regular employees. The employee may be dismissed at any time during the probationary period should the employee's service be unsatisfactory to the Company.

21.2    A regular employee who is promoted or transferred to a position will be required to serve a thirty (30) day trial period before being considered a regular employee in the promoted position. At any time during the trial period should the employee's service be unsatisfactory to the Company, the employee may be transferred back to the employee's previous job, and the employee shall retain the departmental seniority earned during the previous job. In all other respects, the employee will be treated as any regular employee of the Company.

21.3    The Company will continue the practice of notifying the Union on a form attached hereto marked Exhibit "D," of all hirings, terminations from the payroll, and promotions, together with the reason for any terminations.

21.4    Promotions and Vacancies.

21.4.1    Where a vacancy occurs in a department in the bargaining unit, qualified applicants with seniority in that department shall be given preference. Where a vacancy occurs in a department in the bargaining unit where there are no qualified applicants available, preference shall be given to qualified applicants in the bargaining unit with seniority in the Company. A qualified employee with less service may be promoted to an available vacancy in the bargaining unit where it can be shown that such employee is superior in ability and past performance to the qualified applicants with seniority.

21.4.2    Promotions or vacancies which occur in the offices or in any department of the Company not in the bargaining unit shall be filled by qualified regular employees of the Company, provided such employees are available.

21.4.3    A regular employee promoted to a higher classification will be permitted the option of returning to the position held immediately prior to such promotion provided, however, that such option of return is exercised by writing to the personnel manager prior to the thirtieth (30th) calendar day of the trial period.

21.4.4    Notice of vacancies in the Company (excluding the positions of officers of the Company, department heads and their assistants, secretaries, and temporary vacancies of less than thirty [30] calendar days' duration) with starting rates shall be posted on the proper company bulletin boards ten (10) days (excluding Saturdays, Sundays, and holidays) before such vacancies are filled. Positions not filled within six (6) months of the original posting date shall be reposted before such vacancies are filled. The Company shall make every effort to fill vacancies as soon as possible and agrees that vacancies should be filled within a six-month period of the original posting date.

21.4.5     The Company will post a status update every two (2) weeks on vacancy selections in progress.

21.4.6     The Company and the Union recognize that test scores may not necessarily reflect the true measure in all cases of the professional ability of the individual. The Company will take into account such factors as seniority and demonstrated skills in the promotion and selection process.

Section 22.   Seniority.

22.1     Seniority shall be defined as the employee's length of continuous bargaining unit service with the Company. It shall commence from the date of hire into a bargaining unit classification. Company seniority shall apply for the purpose of calculating of employee benefits, to establish seniority ranking in the event of layoff, or other involuntary disruption of employment affecting the unit employee.

22.2     Seniority will be terminated by discharge for just cause, voluntary resignation, failure to accept recall from layoff status, or periods of time exceeding ninety (90) continuous days of service in a nonbargaining unit position.

22.3     Department seniority shall be defined as the employee's length of continuous bargaining unit service in a company department as set forth in Exhibit "A." Department seniority shall apply for the purpose of establishing priority for promotion in accordance with Section 21 of this Agreement. Persons transferred from one department of the Company to another may carry their previously accumulated department seniority with them for possible later return to their old department provided they remain qualified.

22.4     Bus operator section seniority shall be defined as the employee's length of total service as a Bus Operator. Bus operator section seniority shall begin from the date of the employee's first entry into the Bus Operator section and shall be frozen upon any permanent promotion or permanent transfer into another section or department. Should said employee voluntarily request a return to the Bus Operator section, the employee's Bus Operator section seniority shall accrue starting at the previously frozen level. Should said employee be involuntarily required by the Company to return to the Bus Operator section by reason of layoff or other Company restructuring, said employee's length of service in other sections or departments shall be recognized as accrued bus operator section seniority providing such employee remains qualified to operate a bus. Bus operator section seniority shall apply for the purpose of bidding for runs and days off in accordance with Section 42 of this Agreement.

22.5     An employee who refuses recall back to a previously held classification shall have said employee's bus operator seniority treated as a voluntary return.

22.6    Returning to Bargaining Unit.

22.6.1    The bargaining unit seniority and service credit of a unit employee promoted to a nonbargaining unit classification shall continue to accrue provided the period in a nonbargaining classification does not exceed ninety (90) calendar days.  Upon return to a bargaining unit classification, the employee as a condition of continued employment will be required to tender directly to the Union within sixty (60) calendar days all lawful union dues during the period spent working a nonbargaining unit classification.

22.6.2    If a unit employee leaves the bargaining unit for over ninety (90) calendar days of work and later returns to a bargaining unit position, said employee shall be treated as a new hire for the purpose of bargaining unit seniority.

Section 23.    Temporary Transfers.

23.1    An employee required to work temporarily on a job of a higher classification shall receive the pay of the higher classification.  Any work performed in such job during any hour shall be compensated for at the higher rate for the entire hour.

23.1.1    An employee required to work temporarily on a job of a lower classification shall receive the pay of the employee's regular wage classification unless such change is made permanent.

23.1.2    A transfer made for the convenience of an employee shall not be deemed a temporary transfer irrespective of the duration of the transfer provided the local Union is notified and there are no objections or grievances filed in a thirty (30) day calendar period.

23.1.3    Any temporary transfer for a period of more than thirty (30) calendar days shall be made under the bidding procedure as outlined in Section 21.4, Promotions & Vacancies.  Such transfer shall be considered as qualification toward any future promotions in that particular job classification.

23.1.4    All other transfers shall continue at the discretion of management but shall not be considered as qualification toward any future promotions.

23.2    The intent of this section is that temporary transfers shall not be made arbitrarily or discriminatory or for the purpose of pre-qualifying certain employees for possible future promotions.  Whenever possible, senior employees shall be given preference for any temporary transfer to a higher classification, depending on qualification and ability.

23.3    Bargaining unit employees temporarily performing the duties of a higher-paid nonbargaining unit classification shall receive the pay of that classification but no more than 110 percent (110%) of the represented employee's regular rate.  No

bargaining unit employee shall be required or compelled to accept a temporary transfer to a nonbargaining unit position.

Section 24.   Layoffs and Recall.

24.1   Employees will be laid off in accordance with company-wide seniority in the classification in which layoffs occur.  The Company will make every reasonable effort to provide employees identified for layoff with a minimum of two (2) weeks' advance notice.  The general layoff procedures of nonprobationary employees shall be applied in accordance with the following principles and conditions:

24.1.1   An employee scheduled for layoff who has attained the greatest seniority will be placed in an available opening in a lateral or higher classification in lieu of layoff provided, however, that the employee is qualified on the basis of prior training or work experience including work experience with the Company.

24.1.2   In the event there is no available opening, an employee scheduled for layoff will be permitted to displace the least senior employee in a lower-rated classification previously held.

24.1.3   In the event there are no less-senior employees in a lower-rated classification previously held, the employee scheduled for layoff will then be permitted to displace the least senior employee in a lower classification not previously held provided, however, that the employee is qualified on the basis of prior training or work experience, including work experience with the Company.

24.1.4   For the purpose of this Section 24, a classification shall be considered to have been previously held when it shows on company records that the employee has been classified in a classification for a minimum of five hundred (500) work hours.

24.2   Recall.

24.2.1   Layoffs shall be considered of a temporary nature in that when vacancies occur in classifications previously held for which employees are qualified, they shall be recalled to work in order of company-wide seniority.  In addition, bargaining unit employees shall also be considered for recall upon an available opening to classifications not previously held before resorting to open hire provided, however, that the employee is qualified to perform the work available, and the recall list of the classification has been exhausted.

24.2.2   Any offer of recall shall be made by certified mail to the last known address on file with the Company.  An employee's name will be stricken from the recall list should the employee fail to answer a recall letter within seven (7) working days or the employee refuses recall.

24.2.3   Any employee recalled to work will retain any sick leave credit accumulated as of the date of layoff.

24.2.4   Employees recalled to work from layoff status shall be credited with accrued seniority less the period during which they were off the company payroll.

24.2.5   Nothing herein shall be construed as a work guarantee or no layoff policy provided this does not alter Section 44 hereof.

Section 25.   Severance Pay.

25.1   An employee who has completed ten (10) or more years of continuous service with the Company and who is permanently dropped from the Company's service because of a reduction in force shall receive forty (40) hours' severance pay for each full year of continuous service, with such pay computed at the employee's basic straight-time rate of pay at the time of termination.

25.2   Severance pay will not be paid in the event of resignation, discharge, retirement, or death.

25.3   Any employee who accepts severance pay under this section will, if a job opening occurs, be given preference for the job provided the employee is qualified to perform the job.  If rehired, however, it will be as a new employee.  The Company's obligation toward notifying such employee of the job opening shall be limited to sending notice of the job opening by registered mail to the employee's last known address with a copy of such letter to the Union.  If the Company has not heard from the employee within ten (10) calendar days from the time such letter is mailed, it will be deemed that the employee is not interested in the job and will be disqualified for any such job opening opportunities in the future.

Section 26.   Health & Welfare Medical, Dental, Prescription Drug, and Vision Care Plans.

26.1   The Company shall contribute to the Hawaii Teamsters Health and Welfare Trust Fund on or before the 15th of each month, the sum determined by the Trust Fund trustees to maintain the health and welfare medical, prescription drug, dental, vision care, and life insurance benefits for each covered employee who has been compensated for at least eighty-seven (87) straight-time hours during the previous calendar month.

26.2   The parties mutually agree that the benefits and level of benefits to be provided shall be determined solely by the Trustees of the Hawaii Teamsters Health and Welfare Trust Fund, and the Company shall continue to pay for any increased cost as determined by the Trustees of the Hawaii Teamsters Health and Welfare Trust Fund.

- 19 -

Section 27.   <u>Disability Retirement Approved by Social Security</u>.

27.1   For purposes of this section, the disabled employee must:

27.1.1   Be fully vested by the Western Conference of Teamsters Pension Plan;

27.1.2.   Retire on or after August 1, 1994; and

27.1.2   Have been approved by the Social Security Administration for permanent disability under the Social Security Act.

27.2   Pursuant to the Agreement of November 1, 1994, the Company agrees to continue making monthly contributions to the appropriate Health and Welfare Fund for each eligible employee and his/her dependents, who is awarded permanent disability benefits under the Social Security Act for a maximum period of twenty-four (24) months following the month of the disability or until the first month in which the employee is eligible for Medicare coverage, whichever comes first.  The twenty-four (24) month period shall begin in the month following the month in which the award is made by the Social Security Administration.

27.2.1   In the event that an employee has applied for disability benefits under the Social Security Act but such application has not yet been approved, the employee may, at his/her option, continue health and welfare coverage by making self-payments directly to the Teamsters Health and Welfare Trust Fund at the Trust Fund's COBRA rates.  In the event that the employee's application for a disability pension under the Social Security Act is subsequently approved, the Company shall reimburse the employee for COBRA self-payments up to a maximum of three (3) additional months' payments.

27.2.2   The Company also agrees to continue to make monthly contributions for employee and his/her dependents, who may have been granted an early retirement disability pension under the Social Security Act after September 1, 1992, for a maximum of twenty-four (24) months or until the employee is eligible to receive Medicare coverage, whichever comes first.  No retroactive payments will be made to employees who retire for medical reasons prior to September 1, 1994.

Section 28.   <u>Supplemental Health Plan for Retired Employees and Spouses</u>.

28.1   The Company agrees to contribute forty-six cents ($0.46) per straight-time compensable hour toward a supplemental health fund for retired workers and their spouses.

28.1.1   Effective March 1, 2009, the Company shall increase its contributions to the supplemental health fund to fifty-one cents ($0.51) per straight-time compensable hour.

28.1.2    Effective March 1, 2010, the Company shall increase its contributions to the supplemental health fund to fifty-seven cents ($0.57) per straight-time compensable hour.

28.1.3    Effective March 1, 2011, the Company shall increase its contributions to the supplemental health fund to sixty-four cents ($0.64) per straight-time compensable hour.

28.1.4    Effective March 1, 2012, the Company shall increase its contributions to the supplemental health fund to seventy-two cents ($0.72) per straight-time compensable hour.

28.1.5    Effective March 1, 2013, the Company shall increase its contributions to the supplemental health fund to eighty-one cents ($0.81) per straight-time compensable hour.

28.2    For purposes of this Section 28, retired workers are defined to include those workers who meet the following eligibility rules:

28.2.1    Be at least age 62 at the time of retirement;

28.2.2    Be fully vested by the Western Conference of Teamsters Pension Plan;

28.2.3    Retired on or after July 1, 1984.

28.3    The Trustees are directed to continue all existing benefits to retirees and workers who are receiving such benefits as of July 1, 1986, or who thereafter first became eligible for such benefits.  At such time as it appears, based on the advice of the Fund's consultant, that contributions will not support the existing benefits, the Trustees shall determine how best to structure such supplemental benefits from the amounts made available by these payments.  The Company will discuss an alternate plan or administrator with the Union.

28.4    <u>Early Retirement Health (Bridge Insurance)</u>:  The Company agrees to pay 100 percent (100%) of the medical premiums for existing employees who elect early retirement under the Western Conference of Teamsters PEER-84 program.  To be eligible for this benefit, the employee must:

1)    Qualify for PEER-84;

2)    Be employed by the Company at the time of separation; and

3)    Be at least:

a)    59½ years of age at the time of separation;

- 21 -

    b) 59 years of age at the time of separation between January 1, 2009, thru December 31, 2009;

    c) 58 1/2 years of age at the time of separation between January 1, 2010, thru December 31, 2010;

    d) 58 years of age at the time of separation between January 1, 2011, to the end of the contract.

  It is anticipated that the Hawaii Teamsters Health and Welfare Plan trustees will allow early retirees to participate in the medical plan covering active employees and at the same cost.  In the event that the Trustees do not approve early retiree participation at the same cost, the Company and the Union will reconvene to discuss alternative measures for fully funding "bridge" health insurance for PEER-84 qualified employees seeking early retirement.  In the event that early retiree health insurance exceeds the cost of health insurance for active employees, the Company will pay up to the cost of health insurance premiums in effect for active employees.  The "bridge" insurance program shall terminate when the employee attains age 62 at which time the employee will transition into the Supplemental Health Plan for Retired Employees and Spouses (per Section 28).

Section 29. Sick Leave Death Benefit.

  29.1 The Company shall pay a fifty percent (50%) credit of accumulated sick leave to the designated beneficiary of a deceased employee within thirty (30) days of receipt of a bona fide claim consistent with the requirements of Hawaii law.

Section 30. Physical Examinations Required by the Employer.

  30.1 Any employee who is required to undergo an annual physical examination shall receive two (2) hours straight-time pay if the examination occurs on the employee's own time.

Section 31. Group Legal Services.

  31.1 The Company shall contribute to an approved trust fund, on account of each member in the bargaining unit, five cents ($0.05) for each straight-time compensable hour toward a group legal services plan.  It is agreed that none of the services provided by this plan shall be used in any suit or action by the Union or its members against the Company and/or its officers and employees or against the City and County of Honolulu.

Section 32. Retirement and Layoff Credit.

  32.1 Upon retirement or layoff, an employee shall receive a retirement credit for accumulated sick leave.  The retirement credit shall be paid in a lump sum.  The value of the retirement credit shall be determined by multiplying the number of accumulated sick leave hours by one hundred percent (100%) of the employee's then

current straight-time hourly rate.  For purposes of this section, the number of sick leave hours shall be determined on the basis of eight (8) hours per day of accumulated leave.

32.2    To qualify for the benefits under this Section 32, a retiring employee must meet the following eligibility rules:

32.2.1    Be at least age 60 at the time of the retirement or qualified under the Western Conference of Teamsters "Golden 84" Pension Plan;

32.2.2    Be fully vested by the Western Conference of Teamsters Pension Plan;

32.2.3    Retire on or after April 8, 1990.

Section 33.    Pension Plan.

33.1    The Company agrees to accept the provisions of the Western Conference of Teamsters Pension Trust Fund and their successors in trust are and shall be its representatives and consents to be bound by the rules and regulations established or as may be established by the trustees of such Trust Fund.  The Parties acknowledge that the five-cent (\$.05) safety incentive increase achieved pursuant to Section 41.7 is permanent.  The Company shall contribute into the Western Conference of Teamsters Pension Trust Fund on account of each member in the bargaining unit a sum of Three Dollars and Sixty cents (\$3.60) for each straight-time hour for which compensation is paid, which shall not include any overtime hours or fraction thereof as defined in Section 17, said amounts to be computed monthly.

33.2    In addition, the Company shall continue to contribute an additional six and one-half percent (6.5%) of the pension contribution per compensable straight-time hour for the PEER (Golden 84) program.

33.3    Effective March 1, 2009, the Company shall increase its contribution for basic Western Conference of Teamsters Pension Plan benefits to Three Dollars and Eighty-Five Cents (\$3.85) per straight-time hour for which compensation is paid but not for overtime.

33.4    Effective March 1, 2010, the Company shall increase its contributions to the Western Conference of Teamsters Pension Plan to Four Dollars and Ten Cents (\$4.10) per straight-time hour for which compensation is paid but not for overtime.

33.5    Effective March 1, 2011, the Company shall increase its contributions to the Western Conference of Teamsters Pension Plan to Four Dollars and Forty Cents (\$4.40) per straight-time hour for which compensation is paid but not for overtime.

33.6    Effective March 1, 2012, the Company shall increase its contributions to the Western Conference of Teamsters Pension Plan to Four Dollars and Sixty Cents (\$4.60) per straight-time hour for which compensation is paid but not for overtime.

33.7   Effective March 1, 2013, the Company shall increase its contribution to the Western Conference of Teamsters Pension Plan to Four Dollars and Eighty Cents ($4.80) per straight-time hour for which compensation is paid but not for overtime.

33.8   The Company shall increase its contributions to the Western Conference of Teamsters Pension Plan in accordance with its Safety Incentive Program contribution rate as specified in Section 41, if applicable.

33.9   Deferred Compensation Plan.  The Company shall continue the employee 457K deferred compensation plan as was established as directed by the Trustees of the OTS-Hawaii Teamsters Retirement Trust Fund.  The Trustees of the Plan may expend funds for the purpose of administration, plan consultant, legal expenses, etc., necessary for the proper establishment and administration of the employee 457K deferred compensation plan but not as for the purpose of making contributions or matching contributions for individual employees.  The employee 457K deferred compensation plan and all investment activity thereof shall be managed by an established financial institution located in the State of Hawaii.

Section 34.   Departmental Practices.

34.1   CDL Renewal.  Upon obtaining a CDL renewal, the employee shall be reimbursed for the CDL renewal license fee.

34.2   Cars for Road Supervisors.  Road supervisors' cars shall be air conditioned as soon as practicable as vehicles are replaced.

34.3   Accident or Other Reports.  All employees who are required to make out an accident report, evaluations, or other information to the Company outside of their working hours will be paid one-half (1/2) hour time at their regular straight-time rate of pay for each report.  No employee shall submit or be required to submit information to the Company that is false.

Section 35.   Paydays.  Paydays for hourly employees shall be on the fifth (5th) and twentieth (20th) of each month when possible, but in no case shall the payday be delayed more than two (2) days.  For the convenience of employees, the Company shall post the payday schedule semiannually.

Section 36.   Payment for Court Appearance and Jury Duty.

36.1   Any employee who is required by the Company to appear in court during off-duty hours shall be paid for the actual time the employee is required to be available.

36.2   Employees who are called to serve or who serves on a trial jury shall be relieved of their regular duties during the period of such service and will be paid the difference between the amount paid by the government for such jury duty and the regular straight-time rate of pay for the time during that period when they would ordinarily have been working.

Section 37.   Extra Work for Non-Operators.   Extra work outside the Transportation Department will be rotated among qualified employees, giving due consideration to the express desires of employees regarding additional work.

Section 38.   Free Transportation.   Free transportation shall be granted to all employees over all lines operated by the Company.

Section 39.   Traffic Violations.

39.1   Each employee while operating a company vehicle will be responsible for all traffic violations.  An employee arrested for a traffic violation shall discuss the matter with the appropriate superintendent or department head before reporting to court or consulting the Company's attorneys.  An employee operating a company vehicle and arrested for a traffic violation may call upon the Company's attorneys without cost for advice.  The services of the attorneys are not, however, available for court cases unless employed by the individual employee.  Should the employee, after retaining the Company's attorney, be acquitted in court or have the case dismissed or a nolle prosequi entered, the Company will assume the attorney fees, court costs, and lost time.

39.2   The Company shall pay the fine, costs, and lost time which an employee has had to pay or bear because of a traffic violation caused by faulty equipment which came about through no fault of the employee.

Section 40.   Leaves of Absence Without Pay.

40.1   Employees holding elective or appointive office in the Union shall be granted leaves of absence on union business, without pay and without loss of seniority, when requested in writing, provided reasonable notice shall be given for such leaves of absence.  The number of such employees shall be restricted to such number as will not interfere with the operations of the Company.  Such employees shall, upon their return to duty, be placed in the positions to which they would be entitled had they not been granted leave.

40.2   Employees with one (1) year of service shall be granted leave of absence without pay for a period of up to six (6) months for disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom.  This period may be extended through mutual consent of the Company and the employee.  Seniority shall accrue during the leave of absence.  The commencement of the leave of absence shall be subject to the requirements of the position and the physical condition of the employee as attested to by a qualified physician.

40.3   An employee returning from a leave of absence without pay for disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom shall be reinstated in the employee's former position.  If the employee's former position has been eliminated, the employee shall be reinstated in a position similar to the one vacated.

Section 41.   Committee on Safety.

41.1   Realizing that there are many conditions of safety connected with the Company's operations which cannot be dealt with specifically in an agreement and which should be adjusted to the benefit of the Company and its employees, the Company and the Union will establish a Committee on Safety within two (2) weeks of the signing of this Agreement.

41.2   The Company will appoint three (3) representatives and the Union will appoint three (3) employees of the company as representatives. The Committee will elect a chairman. Vacancies shall be filled within one (1) week of their occurrence. The Committee will meet at least quarterly during normal working hours. Union members of the Committee shall be paid for time spent in committee meetings not to exceed one (1) hour per meeting at straight-time rate, if such meetings are held when such employees are not on duty.

41.3   A representative of the Union, not necessarily an employee of the Company, shall be authorized to make a monthly safety inspection tour of facilities and equipment. Such union representative may report any findings and recommendations to the Committee on Safety. The status of such union representative shall be merely that of advisor to the Committee.

41.4   The Committee shall also receive suggestions relative to health and safety measures from Management and employees.

41.5   It shall consider such matters and, upon a favorable vote of a majority of its members, make recommendations to the Company and the Union. A minority may also file and make public a report on any such matter. The Company and the Union shall give careful consideration to all recommendations of the Committee.

41.6   Accident Policy. An employee involved in a major accident involving a company vehicle may be placed on leave of absence with pay computed on the basis of eight hours per day at the regular rate pending the outcome of the investigation for a period not to exceed thirty (30) working days. During the investigation period, the Company reserves the right to assign the employee to training or to alternative job duties in lieu of a paid leave of absence. With respect to major accidents, the Union may designate one representative from the Committee on Safety who shall be entitled to review the evidence and to vote with regard to whether the accident was preventable.

41.7   The parties mutually agree to a safety program incentive for bargaining unit employees to provide increased contributions to the Western Conference of Teamsters Pension Fund based upon reductions of the percentage rate of operator and maintenance work hours due to compensable injuries or illness under the Workers' Compensation Act, in comparison with actual operator and maintenance work hours.

The incentive contribution to the pension plan shall be made for each compensable straight-time hour for which other pension contributions are made, commencing September 1, 1998, and will be as follows:

| Achieved Rate During Prior Completed Fiscal Year | Incentive Pension Contribution |
| --- | --- |
| 3.0% or better (lower) | 5 cents |
| 2.0% or better (lower) | 10 cents (noncumulative) |

Section 42.   Sign-ups for Runs.

42.1    Sign-ups for runs shall be held quarterly and completed not less than ten (10) days prior to the date on which each quarterly schedule goes into effect.

42.2    Quarterly schedules shall become effective as follows: the first Sunday in March, the first Sunday following the closing of public schools in June, the Sunday before the opening day of public schools in September, and the first Sunday in December.

42.3    When schedules are changed for regular quarterly sign-ups, they shall be posted in the schedule room along with a corrected departmental seniority list of all operators five (5) days (including Sundays and holidays) before each sign-up. Such schedules and seniority list shall be made available to the Union.

42.4    Should there be a general revision of schedules on any line, a new sign-up will be held for that line provided, however, that should more than five (5) runs be eliminated from that line, a general sign-up will be held. When line sign-ups occur, a run which is made up of work on two (2) or more lines will be considered as a run on the line on which the longest period of time is worked. After any two (2) such line sign-ups have been held in any one scheduled quarter, an additional general schedule revision on any line will require a general sign-up for the balance of that quarter.

42.5    When line sign-ups occur or when there is a general sign-up between regular quarterly sign-ups, the schedules will be posted in the schedule room four (4) days (excluding Sundays) along with a corrected departmental seniority list of all operators before each sign-up.

42.6    The Company agrees that eighty-five percent (85%) of the scheduled runs in the Transportation Department will be completed within thirteen (13) consecutive hours, including reporting time and travel time. One hundred percent (100%) of the regular scheduled runs will consist of at least eight (8) hours of work per day, including reporting time and travel time allowances.

42.7    An unattached extra which consists of seven (7) or more hours of work and which goes out more than two (2) times in any calendar week will be considered as a regular run for the balance of the sign-up and will pay eight (8) hours if and when it goes out.

42.8    Any operator who is not present at a sign-up and who has not notified the Company by memorandum of the desired runs shall be signed up on a run by a representative of the Union provided, however, that the Union shall notify the Company in writing who its representative will be at least three (3) days prior to any sign-up. In the event that neither the operator nor a representative of the Union is present at the sign-up and the Company has not been notified by memorandum of the run for which the operator desires to sign, the Company official in charge of the sign-up will sign the operator on the run most similar to the operator's previous run or, in the opinion of the official, a better run.

42.9    An operator who does not wish to sign up for a regular run at any general or line sign-up may elect to be placed on the extra list without loss of seniority for sign-ups, even though the operator may pass up a run which becomes vacant.

Section 43.    Extra Work.

43.1    The assignment to operators of extra runs will be handled as follows:

43.1.1    Operators may volunteer for extras by 12:00 noon on the day previous to that on which they desire an extra.    If they so desire, they may also volunteer for the entire week in advance or for any part thereof.  Should more operators volunteer than are needed to fill the extras available, seniority shall prevail in selecting the volunteers.

43.1.2    However, an operator with seniority who has filled one extra will not take out another the same week while there are volunteers waiting who have not yet taken out their first extra.

43.1.3    In case of an abnormal amount of extras necessary for special or chartered service, the Company will post a request for additional volunteers for this service as soon as information is available.

43.1.4    If a sufficient number of operators have not volunteered by 12:00 noon on the day previous to the one on which service is required, the remaining extras will be assigned to operators on a rotating basis.  Exceptions will be made to procedure by the proper official on the basis of physical qualifications, emergencies, or if working extras entail an excessive number of hours.  The assignment of extras, both voluntary and Company assigned, will be posted by 2:00 p.m. on the day previous to the work.

43.1.5    Anyone having an extra assigned by the Company who can obtain a satisfactory substitute will be permitted to do so.  The substitute maintains the former position on the rotation list, and the operator obtaining the substitute will be placed on the rotation list in the same manner as if the operator had worked.

43.1.6    Operators who oversleep when assigned by the Company to work extra hours or who fail to take out extra work assigned will be carried over at the head of the rotation list for work the following day.

43.2   It is understood that as long as sufficient volunteers are obtained there will be no necessity for assigning extra work and the rotation list will remain inactive. Extra work will be assigned only when there are not a sufficient number of volunteers.

Section 44.   Extra List Operators' Guarantee.

44.1   For the purpose of this section, a stand-by report is defined as reporting to the dispatcher at any one of the reports listed on the daily work sheet for the purpose of standing by for possible work assignment and shall specifically not include other reports required by the Company such as reports at the conclusion of an assignment, reports for extras, reports for charters, reports for previously assigned work schedules, etc.

44.2   Extra list operators shall not be required to stand by more than fifteen (15) reports per month of such duration as specified by the Company provided, however, that an extra list operator shall not be required to standby more than one (1) report per day and this standby report shall be of no more than four (4) hours' duration from Monday through Friday and no more than five (5) hours' duration on Saturdays, Sundays, and holidays. An extra list operator who stands by the full number of reports designated by the Company shall be guaranteed Two Thousand Dollars ($2,000) per month.

44.3   In the event an extra list operator on report does not catch out, the operator shall be paid Ten Dollars ($10) on weekdays for the period the operator stands report. If the operator does catch out, the operator shall receive the amount which the run calls for as the total compensation for the time the operator stood on report plus the time spent in operating the run. If the compensation spread over the time of the run plus the time the operator stood the report is less than Ten Dollars ($10), the Company will pay such amount as is necessary to bring the total compensation up to Ten Dollars ($10).

44.4   In no event shall the report time stood by an extra list operator be considered in determining time worked by that operator for purposes of computing overtime or spread-time compensation under this Agreement.

44.5   It is understood that the Company will reduce the amount due under this guarantee in proportion to the number of reports which an extra list operator, through no fault of the Company, fails to stand by in relation to the number of reports designated by the Company. Upon request, the Company shall within seven (7) calendar days make known to the Union the number of reports which an extra list operator, through no fault of the Company, fails to stand by in relation to the number of reports designated by the Company.

44.6   Work performed by an extra list operator on the operator's regularly scheduled day off shall not be counted toward the guarantee.

44.7   When the work performed by an extra list operator other than on a full scheduled regular run (stand-by time specifically included) is in excess of a spread of

- 29 -

twelve (12) hours in any one day, the Company will pay ONE and ONE-HALF (1 1/2) for that portion of the work which is in excess of a spread of twelve (12) hours.

Section 45.   After Hours Extra Guarantee.  An operator required by the Company to report after working hours for extra work shall be guaranteed a minimum of one (1) hour's work.

Section 46.   Regular Run Guarantee.

46.1   An operator signed on a regular run shall be guaranteed at least the amount of pay the regular run calls for should the regular run be canceled and the operator be placed on another run.

46.2   Should an operator's run be increased after a sign-up, the Company will pay ONE and ONE-HALF (1 1/2) for such increase as long as such increase is in effect. However, where a run has some guarantee time, the operator will be paid ONE and ONE-HALF (1 1/2) only for that portion of the increase in excess of eight (8) hours.

46.3   In the event the length of the run is reduced, whether temporarily or otherwise after a sign-up, the operator will be paid for the length of the run if such run is taken out for which the operator originally signed; and the operator may, pursuant to the present practice, be required to stand by for the time the operator would have been working.

46.4   Operators reporting for regular scheduled runs which are assigned to them and which do not go out because of inclement weather shall be paid a minimum of four (4) hours and shall be required to stand by.

Section 47.   Report Time.

47.1   Operators who are required to report to the dispatchers at the start of their run will be paid an allowance for the purpose of reporting and completing a pre-trip inspection of their vehicle when taking their run from the car house.

47.2   Report Time Definition.  Time an operator is required to report to Dispatch at the start of his/her duty to prepare a bus for pull-out from the yard, to make a street relief, or assignment of a shuttle vehicle.

47.3   Report time allowance shall be paid as follows:

(1)  Fifteen (15) minutes if assigned a vehicle from the garage.

(2)  Five (5) minutes for street relief if it is the operator's initial report for the day.

(3)  One (1) minute if the operator is the assigned driver of a shuttle vehicle to a street relief point and it is not the operator's initial report of the day.

Section 48.   Travel Time.

48.1   Travel Time Definition.   The time allowance for an operator to travel:

(1)  From a car house to a relief point.

(2)  From a relief point to a car house.

(3)  From a relief point to another relief point.

48.2   Travel Time Calculation.

(1)  By Bus:  Actual base running time by regular service routes plus a reasonable walking time to the actual relief point.

(2)  By Shuttle Vehicle:  Average travel time by shuttle vehicle.  When a split shift occurs, the Operator shall be compensated for travel time.  Travel time shall be measured from the relief point to the carhouse and later from the carhouse to the relief point.  The Operator shall not be compensated for waiting time between the split shifts.

(3)  Walking:  A reasonable walking time to the relief point.

48.3   Relief Point Locations and Travel Times.   The Company shall maintain a list of current relief points and travel times.  The list will be revised on an annual basis or as necessary due to service changes and agreed to by the Union and the Company.

Section 49.   Safety Awards.  An operator completing the following number of consecutive years of active service without a chargeable accident will receive a safety award in the amount indicated below:

| Number of Consecutive Years Without a Chargeable Accident | Cash Award |
| --- | --- |
| 1 year | $75 |
| 2 years | $125 |
| 3 years | $175 |
| 4 years | $225 |
| 5 years and thereafter | $275 |

In addition to the awards shown above, employees shall receive the following special anniversary awards:

| Years of Safe Driving (Consecutive Years of Active Service Without a Chargeable Accident) | Additional Award |
|---|---|
| 10 Years | $275 |
| 15 Years | $525 |
| 20 Years | $775 |
| 25 and every add'l 5th year | $1,025 |

Section 50.   Instructor's Pay.

All operators while instructing another operator or trainee on the line will be paid ONE and ONE-HALF (1 1/2) times their regular straight-time rate of pay.

Section 51.   Payment for Court Appearance and Guarantee - Operators.

An operator having a regular run who is required as a result of work with the Company or by the Company to appear in court other than for traffic violations (covered by Section 39) and such court appearance occurs while on duty will be guaranteed what the operator's run calls for but will be available for work under the same conditions as if the operator's had worked the regular run. Any operator on the extra list who is required as a result of work with the Company or by the Company to appear in court other than for traffic violations (covered by Section 39) shall be guaranteed eight (8) hours at the regular rate of pay provided, however, that the operator shall be available for work under the same conditions as any extra list operator. If such court appearance occurs on a day off or while the operator is on vacation, then it shall be considered as time worked and shall be compensated for at ONE and ONE-HALF (1 1/2) the operator's regular straight-time rate of pay. An employee shall report immediately back to the proper company official after the court appearance is completed.

Section 52.   Penalty Time for Spreads.

When the work performed on regular scheduled runs is in excess of a spread of ten and one-half (10 1/2) hours in any one (1) day, the Company will pay ONE and ONE-HALF (1 1/2) for that portion of the run which is in excess of a spread of ten and one-half (10 1/2) hours.

Section 53.   Special Procedure on Days Off – Operators.

53.1   An operator who is released voluntarily after standing a report or reports shall be considered as having a day off on that day when released by the dispatcher.

53.2   When regular days off are canceled by the Company, an operator signed on a relief run shall be paid not less than the relief run would have paid in hours.

53.3   When days off are canceled, a day operator shall not be required to work a night run if an extra operator or a night relief operator is available. Under the

- 32 -

provisions of this paragraph, "night runs" shall mean all runs finishing later than 7:00 p.m.

53.4    An operator signed on a run who under the operator's work schedule does not work on a holiday (other than those named in Section 18 of this Agreement) shall be paid for not less than eight (8) hours' work at the regular rate of pay if required to work or report for work on that day.

Section 54.   Reports for Infractions of Rules.

54.1    An operator being reported by a supervisor for violation of rules, regulations, or orders will be notified and given the reason at the time the violation occurs, if possible.  Otherwise, the operator will be notified in writing by the supervisor and said notification will be placed in a sealed envelope bearing the name of the operator and delivered to him as soon as possible after the violation occurs.

54.2    An operator whose name has been posted for any reason shall report to the proper company official for a private interview at the earliest opportunity and, in any event, within twenty-four (24) hours, excluding Saturdays, Sundays, holidays, and days off.  If the interview is desired because of a complaint against the operator, the operator shall be notified in writing of this fact.

54.3    The operator will be paid a minimum of one-tenth (1/10) of an hour and thereafter to the nearest tenth of an hour at the regular straight-time rate of pay for the time spent in being interviewed by the proper company officials on official company business.

54.4    No operator shall be reprimanded in public.

54.5    Any conflict in the rules or orders of the Company brought to the attention of the Company will be corrected immediately.

Section 55.   Oversleep.

55.1    The first oversleep on the part of any operator will result in being cautioned and warned.  Thereafter the procedure will be as follows:

55.1.1    First oversleep will result in being reduced to the foot of the extra list for one (1) day.

55.1.2    Second oversleep within three (3) months will result in being reduced to the foot of the extra list for three (3) days.

55.1.3    Third oversleep within six (6) months will result in being reduced to the foot of the extra list for five (5) days.

55.1.4    Fourth oversleep within six (6) months will result in being reduced to the foot of the extra list for seven (7) days.

- 33 -

55.1.5    Fifth oversleep in six (6) months will result in being reduced to the foot of the extra list for nine (9) days.

55.1.6    After the fifth oversleep, the operator will be placed on probation; and if the sixth (6th) and seventh (7th) oversleeps are incurred, the operator will be on probation, subject to automatic dismissal.

55.1.7    Sixth oversleep within six (6) months will result in being reduced to the foot of the extra list for eleven (11) days.

55.1.8    Seventh oversleep within six (6) months will result in being reduced to the foot of the extra list for thirteen (13) days.

55.2    If the operator concerned has not been dismissed after the seventh oversleep, the operator will be reduced to the foot of the extra list for fifteen (15) days for each oversleep within the six (6) months' period and will still be subject to automatic dismissal.

55.3    After the second oversleep, a six (6) months' period with no oversleeps shall be required to clear the operator's record of oversleeps.

55.4    An operator's record of oversleeps shall be cleared and the first oversleep thereafter will be considered as being the first oversleep and shall result in the operator being cautioned and warned if an operator has no oversleeps for six (6) months.

55.5    Any operator working a day run, if compelled to work after the allotted time, will not be given an oversleep on the next report unless the operator has been off duty eight (8) hours prior to such reporting time provided, however, the operator reports to the dispatcher within two (2) hours after the operator's reporting time.  Under the provisions of this paragraph, day runs shall mean all runs finished before 7:00 p.m.

55.6    In the event a regular operator on the extra list as a result of a penalty does not catch out, the operator shall be paid minimum wage for the period that the operator stands report.  If no catch out occurs, the operator shall receive the amount which the run the operator takes calls for as total compensation for the time the operator stood on report, plus the time spent in operating the run.  If the compensation spread over the time of the run plus the time the operator stood the report is less than minimum wage, the Company will pay such amount as is necessary to bring the total compensation up to minimum wage.  In no event shall the report time stood by a regular operator on the extra list as a result of a penalty be considered in determining time worked by that operator for purposes of computing overtime or spread-time compensation under this Agreement.

Section 56.   Funeral Leave.

56.1    Employees covered by this Agreement shall be allowed three (3) working days as funeral leave with pay, which shall not be deducted from any other leave to which the employee may be entitled.  Funeral leave shall be granted on such days as

designated by the employee provided they fall within a reasonable period of time after a death in the immediate family.

56.2   For the purpose of this section, immediate family is defined as:  parents, brothers, sisters, spouses, natural or legally-adopted children, parents-in-law, grand-parents, grandchildren, or an individual who has become a member of an immediate family resulting from the "hanai" relationship provided, however, an individual affected by the "hanai" relationship shall be entitled to utilize funeral leave only for those members of immediate family resulting from the "hanai" relationship.  Unmarried employees shall also be entitled to claim funeral leave for one house mate per lifetime.

56.3   If the death or funeral occurs outside the State of Hawaii, the employee shall be granted, upon request, a reasonable number of additional days of accumulated vacation leave or leave without pay for travel to attend the funeral or to make necessary arrangements for a funeral in the State of Hawaii.

Section 57.   Operators' Uniform Shirts.

All regular operator employees shall be entitled to four (4) uniform shirts per year.  Uniform shirts will be obtained by the Company and distributed to employees.

Section 58.   Parking Fees.

58.1   Each employee who may desire to park a personal automobile during regular working hours shall apply to the Company for a parking permit, which shall be valid upon receipt by the Company of the fees hereafter directed from month to month. The fees for parking shall be Seven Dollars and Fifty Cents ($7.50) per month and shall be deducted by the Company by payroll deduction each month.  The parking permit shall not be transferable and shall be subject to such rules and regulations as promulgated by the Company.

Section 59.   Maintenance Department.

59.1   Present Practice.   The Company agrees to continue its present practice of providing free laundry for uniforms in the Maintenance Department and a ten (10) minute coffee break in the morning for employees in the Maintenance Department only.

59.2   Tool Allowance (Mechanics).  Mechanics and skilled trades persons who have worked at least 1,350 hours during the prior fiscal year shall receive a tool allowance of Five Hundred Dollars ($500) per year payable in August and to new hire HEMs.  For purposes of this Section 59, mechanics and skilled trades persons shall include lead person, HEM, first-class and second-class mechanics and skilled trades persons, steam cleaners, apprentices, and helpers only.

59.3   Maintenance Uniform Allowance.  Mechanics and helpers shall, on an optional basis, be provided up to Two Hundred Dollars ($200) per year reimbursement

for department uniforms consistent with the dress code (defined as blue work shirts as currently used).  Said allowance to be paid during the month of August.

59.4     Automotive Service Excellence (Training Course).  Qualified employees may enroll in courses offered by local colleges or technical schools to attain an Automotive Service Excellence Specialty Certification and/or courses pertaining to employees' field of expertise, as approved in advance by the Company.  The Company will reimburse up to One Hundred Dollars ($100) per course with a passing grade.  Thus, if an employee fails the course on the first try but passes on the second try, the maximum reimbursement would be One Hundred Dollars ($100).

59.5     CDL or ASE Renewal.  Upon obtaining a CDL or ASE renewal, the employee shall be reimbursed for the CDL and/or ASE renewal license fee.

59.6     Promotional Examinations.  Maintenance employees taking written promotional examinations will not be required to clock out.  To the extent possible, examinations will be given on Wednesdays to avoid conflict with "days off" as set by internal policy.  The Company will also explore the feasibility of giving the examinations in the evening, on a trial basis, for late shift personnel.

59.7     Lateral Transfers.  With respect to the mechanics classification, permanent lateral transfers are allowable only within similar shops such as AC-to-AC, Brake-to-Brake, Body-to-Body.  All other movements will go through the normal selection process.

59.8     Temporary Transfers (Maintenance Only).  A transfer made for the convenience of the employee shall not be deemed a temporary transfer irrespective of the duration of the transfer, provided the local Union is notified and there are no grievances filed in a thirty (30) day calendar period.

59.9     Maintenance Department Vacancies.  Where a vacancy occurs in the Maintenance Department, qualified applicants with seniority in that department shall be given preference.  Where a vacancy occurs in the Maintenance Department where there are no qualified applicants available, preference shall be given to qualified applicants in the bargaining unit with seniority in the Company.  A qualified bargaining unit employee with less service may be promoted to an available vacancy in the Maintenance Department where it can be shown that such employee is superior in ability and past performance compared to the qualified applicants with seniority.  Thereafter, Hawaii Teamsters Local 996 bargaining unit employees at OTS Paratransit Services shall have first preference over all other applicants.

59.10     Separate Seniority.  It is understood that OTS/TheBus and OTS/Paratransit shall maintain separate seniority lists and said seniority shall not cross over.

59.11     Distribution of Overtime for Maintenance Employees.  Employees regularly assigned to a classification within the Maintenance Department shall be offered the first opportunity to work overtime within their classification before said

overtime is made available to employees temporarily classified in the same classification. Extra work for days off overtime will be rotated by seniority among qualified employees giving due consideration to the expressed desires of the employee regarding extra work.

59.12   Mechanics on Trouble Calls. For mechanics going on trouble calls, heavy equipment mechanic upgrade will be allowable if the nature of the work performed merits heavy equipment mechanic's pay. This determination will be made by the foreman and/or superintendent. Drivers of the wrecker will be paid heavy equipment mechanic's pay while on bus towing assignments.

59.13   Supervisory Upgrade. Whenever a bargaining unit employee accepts work as a relief foreperson or service station supervisor, he shall receive the pay of the incumbent.

59.14   Maintenance Vacation Scheduling. Maintenance employees who are entitled to vacations shall sign for vacations based on seniority prior to March 1 of each year. The Company shall continue current vacation practice. In the event the Company is unable to schedule all such vacation days through the normal vacation sign-up process due to scheduling difficulties and employees' scheduled days off; the Company, at its option, may allow the employee to add the remaining days to the end of a vacation period or pay the employee for vacation days lost.

59.15   Mechanic Training and Apprenticeship Program.

59.15.1   The Company will continue to operate Training and Apprenticeship Program for Mechanics agreed upon by the Union and approved by the State of Hawaii Director of Labor and Industrial Relations. In addition to defined wage compensation, the program will include:

59.15.2   Development of the Training Program.

59.15.2.1   Employees who directly train apprentices or trainees shall be entitled to a premium of ten percent (10%) in addition to their regular rate of pay for designated training time only.

59.15.2.2   A committee of three (3) company and three (3) union members will coordinate joint efforts to the program.

Section 60.   Duration.

60.1   This Agreement is effective and binding upon the parties from July 1, 2008, up to and including June 30, 2013, midnight and from year to year thereafter unless notice is given in writing by either party to the other not more than ninety (90) days and not less than sixty (60) days prior to the expiration date that it desires to amend, modify, change, or terminate this Agreement at such expiration date.

60.2    In case of notice by either party of its desire to modify or change this Agreement, such notice shall contain a memorandum of the proposed modifications or changes and a statement that the party giving the notice is willing to begin negotiations within ten (10) days from the date of the notice.

60.3    There shall be no cutbacks of any benefits for any existing employee during the term of the Collective Bargaining Agreements.

Section 61.    This document contains the entire agreement between the parties. No amendments or modifications may be made to this Agreement unless mutually agreed upon, and signed by the President of both parties or their designees.

Agreed to this 30th day of June, 2008, subject to ratification by the bargaining unit and funding by the City and County of Honolulu.

IN WITNESS WHEREOF, the parties hereto, through their duly authorized representative, have caused these presents to be executed on the 30th day of June, 2008, in Honolulu, State of Hawaii.

OAHU TRANSIT SERVICES, INC.          HAWAII TEAMSTERS AND
                                     ALLIED WORKERS, LOCAL 996


By_____          By_____
  Its President & General Manager      Its President

## Exhibit "A"

Oahu Transit Services, Inc.
Salary and Wage Scale

| | 7/1/2008 | 7/1/2009 | 7/1/2010 | 7/1/2011 | 7/1/2012 |
|---|---|---|---|---|---|
| **Transportation Department** | | | | | |
| Central Radio Controller | $ 4,430.80 | $ 4,599.20 | $ 4,792.40 | $5,012.90 | $5,263.60 |
| Temporary Radio Controller | $ 4,167.00 | $ 4,325.40 | $ 4,507.10 | $4,714.40 | $4,950.10 |
| Road Supervisor | $ 4,264.10 | $ 4,426.10 | $ 4,612.00 | $4,824.20 | $5,065.40 |
| Road Supervisor (first six months) | $ 4,167.00 | $ 4,325.40 | $ 4,507.10 | $4,714.40 | $4,950.10 |
| Temp. Road Supervisor | $ 4,167.00 | $ 4,325.40 | $ 4,507.10 | $4,714.40 | $4,950.10 |
| Instructor | $ 4,264.10 | $ 4,426.10 | $ 4,612.00 | $4,824.20 | $5,065.40 |
| Instructor  (first six months) | $ 4,167.00 | $ 4,325.40 | $ 4,507.10 | $4,714.40 | $4,950.10 |
| Temporary Instructor | $ 4,167.00 | $ 4,325.40 | $ 4,507.10 | $4,714.40 | $4,950.10 |
| Dispatcher | $ 4,264.10 | $ 4,426.10 | $ 4,612.00 | $4,824.20 | $5,065.40 |
| Dispatcher (first six months) | $ 4,167.00 | $ 4,325.40 | $ 4,507.10 | $4,714.40 | $4,950.10 |
| Temp. Dispatcher | $ 4,167.00 | $ 4,325.40 | $ 4,507.10 | $4,714.40 | $4,950.10 |
| **Bus Operators** | | | | | |
| Entry level | $   16.97 | $     17.61 | $     18.35 | $     19.19 | $     20.15 |
| After first year | $   18.19 | $     18.88 | $     19.67 | $     20.57 | $     21.60 |
| After second year | $   19.42 | $     20.16 | $     21.01 | $     21.98 | $     23.08 |
| After third year | $   20.63 | $     21.41 | $     22.31 | $     23.34 | $     24.51 |
| After fourth year | $   21.86 | $     22.69 | $     23.64 | $     24.73 | $     25.97 |
| After fifth year and thereafter | $   23.08 | $     23.96 | $     24.97 | $     26.12 | $     27.43 |

**Exhibit "A" (Cont'd.)**

Oahu Transit Services, Inc.
Salary and Wage Scale

| | 7/1/2008 | 7/1/2009 | 7/1/2010 | 7/1/2011 | 7/1/2012 |
|---|---|---|---|---|---|
| **Vehicle Maintenance Department** | | | | | |
| Lead Tire Supervisor | $ 4,539.90 | $ 4,712.40 | $ 4,910.30 | $5,136.20 | $5,393.00 |
| Lead Tire Mechanic | $ 25.52 | $ 26.49 | $ 27.60 | $ 28.87 | $ 30.31 |
| Lead Mechanic | $ 25.52 | $ 26.49 | $ 27.60 | $ 28.87 | $ 30.31 |
| | | | | | |
| Heavy Equipment Mechanic | | | | | |
| Entry level | $ 20.09 | $ 20.85 | $ 21.73 | $ 22.73 | $ 23.87 |
| After first year | $ 21.18 | $ 21.98 | $ 22.90 | $ 23.95 | $ 25.15 |
| After second year | $ 22.25 | $ 23.10 | $ 24.07 | $ 25.18 | $ 26.44 |
| After third year | $ 23.34 | $ 24.23 | $ 25.25 | $ 26.41 | $ 27.73 |
| After fourth year and thereafter | $ 24.42 | $ 25.35 | $ 26.41 | $ 27.62 | $ 29.00 |
| | | | | | |
| Vault Puller Technician | $ 24.00 | $ 24.91 | $ 25.96 | $ 27.15 | $ 28.51 |
| | | | | | |
| Vault Puller | $ 23.59 | $ 24.49 | $ 25.52 | $ 26.69 | $ 28.02 |
| | | | | | |
| Second Class Mechanic | $ 23.59 | $ 24.49 | $ 25.52 | $ 26.69 | $ 28.02 |
| | | | | | |
| Steam Cleaner | | | | | |
| Entry level | $ 16.78 | $ 17.42 | $ 18.15 | $ 18.98 | $ 19.93 |
| After first year | $ 17.98 | $ 18.66 | $ 19.44 | $ 20.33 | $ 21.35 |
| After second year | $ 19.18 | $ 19.91 | $ 20.75 | $ 21.70 | $ 22.79 |
| After third year | $ 20.38 | $ 21.15 | $ 22.04 | $ 23.05 | $ 24.20 |
| After fourth year | $ 21.59 | $ 22.41 | $ 23.35 | $ 24.42 | $ 25.64 |
| After fifth year and thereafter | $ 22.79 | $ 23.66 | $ 24.65 | $ 25.78 | $ 27.07 |
| | | | | | |
| Mechanic Helper | | | | | |
| Entry level | $ 16.01 | $ 16.62 | $ 17.32 | $ 18.12 | $ 19.03 |
| After first year | $ 17.13 | $ 17.78 | $ 18.53 | $ 19.38 | $ 20.35 |
| After second year | $ 18.27 | $ 18.96 | $ 19.76 | $ 20.67 | $ 21.70 |
| After third year | $ 19.42 | $ 20.16 | $ 21.01 | $ 21.98 | $ 23.08 |
| After fourth year | $ 20.55 | $ 21.33 | $ 22.23 | $ 23.25 | $ 24.41 |
| After fifth year and thereafter | $ 21.69 | $ 22.51 | $ 23.46 | $ 24.54 | $ 25.77 |
| | | | | | |
| Service Attendant | | | | | |
| Entry level | $ 15.45 | $ 16.04 | $ 16.71 | $ 17.48 | $ 18.35 |
| After first year | $ 16.54 | $ 17.17 | $ 17.89 | $ 18.71 | $ 19.65 |
| After second year | $ 17.63 | $ 18.30 | $ 19.07 | $ 19.95 | $ 20.95 |
| After third year | $ 18.72 | $ 19.43 | $ 20.25 | $ 21.18 | $ 22.24 |
| After fourth year | $ 19.81 | $ 20.56 | $ 21.42 | $ 22.41 | $ 23.53 |
| After fifth year and thereafter | $ 20.89 | $ 21.68 | $ 22.59 | $ 23.63 | $ 24.81 |

## Exhibit "A" (Cont'd.)

Oahu Transit Services, Inc.
Salary and Wage Scale

| | 7/1/2008 | 7/1/2009 | 7/1/2010 | 7/1/2011 | 7/1/2012 |
|---|---|---|---|---|---|
| **Plant Maintenance** | | | | | |
| Lead Tradesperson | $ 25.52 | $ 26.49 | $ 27.60 | $ 28.87 | $ 30.31 |
| **Journeyman Tradesperson** | | | | | |
| Entry level | $ 17.45 | $ 18.11 | $ 18.87 | $ 19.74 | $ 20.73 |
| After first year | $ 18.85 | $ 19.57 | $ 20.39 | $ 21.33 | $ 22.40 |
| After second year | $ 20.25 | $ 21.02 | $ 21.90 | $ 22.91 | $ 24.06 |
| After third year | $ 21.63 | $ 22.45 | $ 23.39 | $ 24.47 | $ 25.69 |
| After fourth year | $ 23.03 | $ 23.91 | $ 24.91 | $ 26.06 | $ 27.36 |
| After fifth year and thereafter | $ 24.42 | $ 25.35 | $ 26.41 | $ 27.62 | $ 29.00 |
| Second Class Trades | $ 23.59 | $ 24.49 | $ 25.52 | $ 26.69 | $ 28.02 |
| **Trades Helper** | | | | | |
| Entry level | $ 16.01 | $ 16.62 | $ 17.32 | $ 18.12 | $ 19.03 |
| After first year | $ 17.13 | $ 17.78 | $ 18.53 | $ 19.38 | $ 20.35 |
| After second year | $ 18.27 | $ 18.96 | $ 19.76 | $ 20.67 | $ 21.70 |
| After third year | $ 19.42 | $ 20.16 | $ 21.01 | $ 21.98 | $ 23.08 |
| After fourth year | $ 20.55 | $ 21.33 | $ 22.23 | $ 23.25 | $ 24.41 |
| After fifth year and thereafter | $ 21.69 | $ 22.51 | $ 23.46 | $ 24.54 | $ 25.77 |
| **Utility Worker** | | | | | |
| Entry level | $ 13.06 | $ 13.56 | $ 14.13 | $ 14.78 | $ 15.52 |
| After first year | $ 13.94 | $ 14.47 | $ 15.08 | $ 15.77 | $ 16.56 |
| After second year | $ 14.82 | $ 15.38 | $ 16.03 | $ 16.77 | $ 17.61 |
| After third year | $ 15.72 | $ 16.32 | $ 17.01 | $ 17.79 | $ 18.68 |
| After fourth year | $ 16.60 | $ 17.23 | $ 17.95 | $ 18.78 | $ 19.72 |
| After fifth year and thereafter | $ 17.47 | $ 18.13 | $ 18.89 | $ 19.76 | $ 20.75 |
| **Bus Stop Crew Laborer II** | | | | | |
| Entry level | $ 13.71 | $ 14.23 | $ 14.83 | $ 15.51 | $ 16.29 |
| After first year | $ 14.88 | $ 15.45 | $ 16.10 | $ 16.84 | $ 17.68 |
| After second year | $ 16.06 | $ 16.67 | $ 17.37 | $ 18.17 | $ 19.08 |
| After third year | $ 17.23 | $ 17.88 | $ 18.63 | $ 19.49 | $ 20.46 |
| After fourth year | $ 18.41 | $ 19.11 | $ 19.91 | $ 20.83 | $ 21.87 |
| After fifth year and thereafter | $ 19.58 | $ 20.32 | $ 21.17 | $ 22.14 | $ 23.25 |
| **Bus Stop Crew Laborer I** | | | | | |
| Entry level | $ 13.06 | $ 13.56 | $ 14.13 | $ 14.78 | $ 15.52 |
| After first year | $ 13.94 | $ 14.47 | $ 15.08 | $ 15.77 | $ 16.56 |
| After second year | $ 14.82 | $ 15.38 | $ 16.03 | $ 16.77 | $ 17.61 |
| After third year | $ 15.72 | $ 16.32 | $ 17.01 | $ 17.79 | $ 18.68 |
| After fourth year | $ 16.60 | $ 17.23 | $ 17.95 | $ 18.78 | $ 19.72 |
| After fifth year and thereafter | $ 17.47 | $ 18.13 | $ 18.89 | $ 19.76 | $ 20.75 |

## Exhibit "A" (Cont'd.)

Oahu Transit Services, Inc.
Salary and Wage Scale

|  | 7/1/008 | 7/1//2009 | 7/1/2010 | 7/1/2011 | 7/1/2012 |
|---|---|---|---|---|---|
| **STOREROOMS** | | | | | |
| Storekeeper II-Step II | $ 4,050.00 | $ 4,203.90 | $ 4,380.50 | $ 4,582.00 | $ 4,811.10 |
| Storekeeper II-Step I | $ 3,865.70 | $ 4,012.60 | $ 4,181.10 | $ 4,373.40 | $ 4,592.10 |
| Storekeeper | | | | | |
| Entry level | $ 2,728.50 | $ 2,832.20 | $ 2,951.20 | $ 3,087.00 | $ 3,241.40 |
| After first year | $ 2,921.80 | $ 3,032.80 | $ 3,160.20 | $ 3,305.60 | $ 3,470.90 |
| After second year | $ 3,114.90 | $ 3,233.30 | $ 3,369.10 | $ 3,524.10 | $ 3,700.30 |
| After third year | $ 3,308.10 | $ 3,433.80 | $ 3,578.00 | $ 3,742.60 | $ 3,929.70 |
| After fourth year | $ 3,501.30 | $ 3,634.40 | $ 3,787.00 | $ 3,961.20 | $ 4,159.30 |
| After fifth year and thereafter | $ 3,694.50 | $ 3,834.90 | $ 3,996.00 | $ 4,179.80 | $ 4,388.80 |

In recognition of length of service, an additional Ten Cents ($0.10) per hour will be paid after five (5) years of service. For every five (5) additional years of service, an additional Ten Cents ($0.10) will be paid, such amount to be cumulative. The longevity increases shall be made as follows:

|  | Per Hour | Per Month |
|---|---|---|
| 6th year | $0.10 | $17.30 |
| 11th year | $0.20 | $34.60 |
| 16th year | $0.30 | $51.90 |
| 21st year | $0.40 | $69.20 |
| 26th year | $0.50 | $86.50 |
| 31st year | $0.60 | $103.80 |
| 36th year | $0.70 | $121.10 |
| 41st year | $0.80 | $138.40 |
| 46th year | $0.90 | $155.70 |

EXHIBIT "B"

ASSIGNMENT OF WAGES TO COVER UNION
DUES, INITIATION FEE, AND ASSESSMENT

To:   Oahu Transit Services, Inc.

I assign to the Hawaii Teamsters & Allied Workers, Local 996, out of my wages for union  initiation fee, monthly dues, and not more than $2.00 per month as assessments, as certified to you in writing by the Union, and I authorize the payment to the Union each month of the amount so deducted.

This assignment shall be irrevocable until one (1) year from the date below or until the termination date of the applicable Collective Bargaining Agreement (within the meaning of the  Labor-Management Relations Act, 1947), whichever occurs sooner, and shall be automatically renewed, and shall be irrevocable for successive periods of one (1) year each or for the period of each succeeding applicable Collective Bargaining Agreement, whichever shall be shorter, unless at least ten (10) days and not more than twenty (20) days before the expiration of each period of one (1) year, or of each applicable Collective Bargaining Agreement, whichever occurs sooner, I give written notice to the Company of my desire to revoke this assignment, or unless the same shall be automatically canceled as provided for below.  This assignment is automatically canceled when my employment ends or when I cease to be employed in a capacity represented by the bargaining unit.

There  shall be no obligation on the part of the Company to make any deduction beyond the original term of the Collective Bargaining Agreement existing at the date of this assignment unless the Agreement is extended or a new agreement has been negotiated containing an authorization for union fee deductions as provided in the Agreement existing at the date of this assignment.

Date:_____

Employee: _____

Receipt of foregoing assignment is acknowledged:

Oahu Transit Services, Inc.

Date:_____

EXHIBIT "C"

## COMPANY POLICY AND UNION RECOGNITION

It is the policy of the Company to recognize that a strong and responsible union is desirable. The Company also recognizes that a strong and responsible union is possible only to the extent that the employees take part in the Union and its activities. The Company declares that it will not make any statement or commit any act to discourage any employee with respect to membership in the Union.

Your attention is invited to the Agreement between the Oahu Transit Services, Inc., and the Hawaii Teamsters and Allied Workers, Local 996.

Oahu Transit Services, Inc.

EXHIBIT "D"

## NOTIFICATIONS OF HIRING, TERMINATIONS,
## AND PROMOTIONS

Date:

To:   Hawaii Teamsters & Allied Workers, Local 996

The person below has been:

Hired  as_____ on_____

Terminated from payroll because_____on_____

Promoted to_____ on_____

Classification _____Rate $_____

Name_____ Address_____.

Oahu Transit Services, Inc.

By_____

EXHIBIT "E"

# MTLInc.



811 Middle Street, Honolulu, Hawaii 96819

HIROO W. MIYAGI
President and Chief Executive Officer

May 8, 1990

Mr. Tony Rutledge, Vice President
Hawaii Teamsters & Allied Workers
Local 996
615 Piikoi Street, 18th Floor
Honolulu, HI  96814

Dear Mr. Rutledge:

This is to confirm our discussion and understanding reached during the recent contract negotiations:

## "POLICY ON EMPLOYEE ABSENTEEISM"

"The employer shall set guidelines pertaining to reported absences and has established criteria on what is considered excessive absenteeism.  More than six (6) absences within the most recent 12-month period is excessive.  (Absences are defined as failure to report for work due to illness or injuries and/or any unexcused failure to report for work except in situations as stated below.)

The 12-month period is a rolling 12 months in which the month with the most recent absence serves as the starting point.

EXAMPLE:  If the most recent absence occurs in August, you would go back 12 months using August as the first month.  You would be reviewing the period of August in the current year through September of the previous year.  More than six (6) absences within this period would constitute excessive absenteeism.

Absences of the following nature are not included in the total amount:

1.  Tardiness
2.  Maternity leave
3.  Funeral leave
4.  Jury duty
5.  Leave of absences for Union business
6.  Personal leave
7.  Leave of extended trips

Mr. Tony Rutledge
May 8, 1990
Page 2

    8.  Military leave
    9.  Any other types of leave provided at the discre-
        tion of the employer
  10.  Workers' compensation leave
  11.  Absence due to injury and/or illness requiring
        ongoing care such as chemotherapy, dialysis, or
        other required therapy
  12.  Menstrual problems
  13.  Off duty status

The following steps of progressive discipline may be
administered to employees who fall in the category of
excessive absenteeism:

O Verbal warning with counseling
O Written warning with counseling
O Suspension
O If absenteeism occurrences continue as stated herein,
  such employee may be terminated.

The employer agrees to provide an employee's absentee
status not more than once a month when requested."

If this letter is acceptable to you, please signify your
acceptance by signing one copy and returning one copy to us.

Sincerely,

HENRY H. ONISHI, JR.
Executive Vice President and
Chief Operating Officer

C O N C U R R E D :

TONY RUTLEDGE, Vice President       5-24-90
Hawaii Teamsters & Allied Workers     Date

EXHIBIT "F"

Hawaii Teamsters and Allied Workers
Local 996
1817 Hart Street
Honolulu, Hawaii 96819


Gentlemen:

This is in reference to the letter signed by Tony Rutledge dated May 8, 1990, in reference to "Policy on Employee Absenteeism." Both parties agree that there shall be a separate letter of understanding pertaining to the disciplinary process. The following example illustrates how much such a disciplinary process shall be interpreted.

> If an employee at any step of the disciplinary process does not receive another disciplinary step within 12 months of the date of the last disciplinary step, the process shall revert to the beginning of the disciplinary process. Thus, any further discipline in the above example would begin at Step 1 (oral warning)."

Oahu Transit Services, Inc.


By_____     _____
            Its President                                      Date

- 48 -

Hawaii Teamsters & Allied Workers
Local 996
181 7 Hart Street
Honolulu, Hawaii 96819

Gentlemen:

In conjunction with the Collective Bargaining Agreement being executed simultaneously with this letter, it is hereby understood and agreed as follows:

1.    The Company and the Union agree to establish an objective point rating system for the purpose of evaluating employees seeking promotions. This point rating system shall assign numerical scores for the various qualifications necessary to fill a particular position. Each employee seeking promotions shall be evaluated by the above-mentioned procedure and, if the scores attained are equal, the senior employee shall receive the promotion. If a junior employee receives a higher score, the junior employee shall receive the promotion. It is understood that the Union shall have the right to review all such ratings made by the Company and any disagreements on the ratings shall be resolved through the grievance procedure.

2.    It is expressly understood that notwithstanding any provision of the Agreement, employees shall not suffer any reduction of existing wages and benefits.

3.    The Company shall give paid time off to drivers who are involved in accidents causing death.

Oahu Transit Services, Inc.

By _____
Its President

UNDERSTOOD AND AGREED:

HAWAII TEAMSTERS &
ALLIED WORKERS, LOCAL 996

By _____
Its President

- 49 -