Daniel A. Bent, Arbitrator
Dispute Prevention & Resolution, Inc.
Pauahi Tower, Suite 1155
1003 Bishop Street
Honolulu, Hawaii 96813

### THE ARBITRATION TRIBUNALS

### DISPUTE PREVENTION & RESOLUTION, INC.

| | |
|---|---|
| **In the Matter of the Arbitration Between:** | **DPR Case No. 12-0056-A** **Grievance of the Union Re: Scot Park (Various Grievances)** |
| **HAWAII TEAMSTERS AND ALLIED WORKERS, LOCAL 996,** | |
| **Union,** | **Decision and Award** |
| **And** | |
| **OAHU TRANSIT SERVICES, INC.** | |
| **Employer** | |

### DECISION AND AWARD

The above captioned Arbitration came on for a hearing before this Arbitrator on May 23, 24, 25 and June 1 and 8, 2012 in Honolulu, Hawaii. This Arbitrator was selected by the parties through their counsel under the provisions of the Collective Bargaining Agreement (CBA) between the parties. The parties were represented at the Arbitration hearing by counsel. The Hawaii Teamsters and Allied Workers, Local 996 (Union) and Grievant Scot Park (Grievant) were represented by Sean Kim, Esq. Oahu Transit Services, Inc. (Employer or Company) was represented by Wesley Fujimoto, Esq.

**EXHIBIT** 2

The Arbitrator heard the testimony presented during the hearing, read the exhibits, read the transcript and considered all of the evidence, and has read the Post-Hearing Briefs of counsel, considered the authorities cited therein, as well as other legal authority. While all evidence and arguments have been considered, the Arbitrator will address only those directly pertinent and necessary to the Decision and Award.

## Statement of the Issues

Five incidents resulting in discipline being imposed on Grievant were consolidated in this arbitration. They were: 1) a ten (10) day suspension for what the company concluded was lying about an incident involving Ms. Linda Martos on March 30, 2010; 2) a written warning for behaving on December 5, 2010 at Hotel and Smith Streets in a manner offensive or abusive toward... fellow employees and [road] supervisors; 3) a thirty (30) day suspension for what the company concluded was a preventable major accident on March 26, 2011; 4) A ten (10) day suspension for conduct toward a Canadian passenger on May 14, 2011 that the company concluded was offensive and threatening to the public in violation of Section 4.2.1 of the Disciplinary Code; 5) suspension pending dismissal for "policy violations 2.3.5 and 2.3.8 as well as an overall unsatisfactory work record," which arose out of Grievant's allegations against Kevin Holu on November 29, 2011.

The issues for decision by the Arbitrator are as follows:

1) Was the discipline that was assessed against Grievant with respect to *each* of the five incidents for just cause?

2) If not, what is the proper remedy?

## Findings of Fact

The following facts relevant to this Decision and Award have been determined by the Arbitrator, the foregoing five incidents being addressed in chronological order:

**Transfer Incident of March 30, 2010:**

Linda Martos testified as follows: She is a permanent instructor in the training department, T 14, and was a bus operator for 23 years and then a temporary dispatcher and temporary instructor for 10 years. T 15. As a permanent training instructor she is a bargaining unit and Teamsters member. T 16. She instructs bus operators, among other things, handling transfers. T 18.

The Company's policy No. 13.07 "Transfers" states that "transfers should be issued for a minimum of 2 hours and a maximum of 2 hours and 15 minutes from the time the passenger boards the bus." Emp. Ex.1 It also instructs bus operators not to become embroiled in a transfer dispute and to give the passenger the benefit of the doubt. Emp. Ex. 1, p.2. This provision, however, appears to be directed to when an operator is accepting a transfer, although it could conceivably apply to a dispute with a passenger over where the transfer was cut upon its issuance. Emp. Ex.1, p.2.

Ms. Martos testified with respect to March 30, 2010 that at about 10:45 a.m. she caught the next bus to town from the Kalihi transit center, which happened to be driven by Grievant. T 24. She greeted the Grievant with: "Hi, Scot, how are you?" She then sat by the second door in the back of the 60-foot long bus. T 25. When the bus was by Umi Street a Filipino couple got on and she noticed that Grievant was explaining something to them. T 28. They then took a seat directly to her left. T 28. Ms. Martos noticed that the

lady pulled out a transfer and noticed that it was the "whole transfer." T 29. She realized

that because of the policy, it should have been torn off at two hours after the passengers

boarded not at the entire length, which caught her eye. T 29-30.

Because of the length of the transfer she observed, Ms. Martos looked down the

bus aisle and saw that Grievant had the transfer book in the transfer cutter such that they

would be cut "long" which the arbitrator understood to mean set to be cut at their entire

length, T 31. She called her supervisor, Roy Dunlop the training coordinator, by phone

and reported what she had observed and that "right now he is giving out transfers cut at

11:45." T 33. This would be 11:45 p.m. as she described it as "the entire length." T 31.

Both she and her supervisor assumed that "possibly he forgot to readjust" the transfer

book in the cutter. T 33-34.

Ms. Martos' supervisor instructed her to "discretely bring it to his attention." T

33.

She went up to Grievant as the bus approached where she planned to get off,

noticed that the transfers were still in the position in the cutter to be cut at full length and

stood next to him and quietly mentioned to him: "Oh, Scot, are you aware that you're

giving out transfers cut at 11:45?" T 34-35. When she first spoke to Grievant he

"flinched, he jumped" and she concluded that she "apparently" scared him because he

didn't see me coming in the mirror." T 35. Grievant responded to her: "Yes, because I

had a complaint… the office told me to give [the passengers] the benefit of the doubt." T

35. Ms. Martos responded that it is okay to give them the benefit of the doubt but what he

was doing was "a bit too much" and that "You're only supposed to give them two hours."

T35. Grievant responded: "Oh, I didn't know that." T 35. At that point, Grievant

"abruptly" moved the transfer book in the transfer cutter from 11:45 p.m. to 5 p.m. T 35-36. At the time Grievant moved the transfers in the cutter to 5 p.m. it was already after 11:00 a.m. T 36. Ms. Martos testified that Grievant seemed irritated and she didn't want to irritate him. T 36-37. When speaking to him she testified that she was "very quiet" and that "only him and I could hear" and "standing right by his right ear. T 37. Ms. Martos testified that she wasn't talking to Grievant as a passenger was boarding and that she did not say anything more. T 38. Shortly thereafter when she got off of the bus she put her hand on his shoulder and said: "Okay, Scot, ...see you later, have a nice day." T 38.

Ms. Martos testified that *when she went up* to speak to Grievant, she approached him discretely as instructed meaning "quietly" so not to "embarrass him" and so that "the passengers could not hear," T 39. She approached him by saying: "Oh Scot" and he "flinched, he jumped" "apparently because he didn't see him coming in the mirror." T 35.

The Employer conducted an investigation of the incident. The investigation was conducted by Assistant Superintendent Transportation-Kalihi Tracy Kim. This first meeting was not intended to be a disciplinary meeting but it was to inform Grievant of the correct procedure so he could make corrections. T. 454.

In an interview of Grievant, on April 5, 2010 five days after the incident, Grievant told Tracy Kim that Ms. Martos "embarrassed him by scolding him in front of the passengers." Emp. Ex. 4 and T 430.

Tracy Kim subsequently interviewed Ms. Martos to ask her about her behavior towards Grievant and he asked her to submit a more detailed memo of the incident. T 430. The more detailed memo on the incident was submitted by Ms. Martos on April 6, 2010. Emp. Ex. 5. On April 14, 2010 in a follow-up meeting by Tracy Kim, while

reviewing the incident again Grievant interjected "She also slapped me which is a form of harassment." Emp. Ex. 4 and T 433. This was the first time Grievant mentioned this to Tracy Kim. Emp. Ex. 4 and T 433. Mr. Kim was "puzzled as to why he didn't tell me that [she slapped him] the first time when he said that Linda had yelled at him and scolded him and embarrassed him." T 433. Grievant also admitted in his own testimony that he informed Mr. Tracy Kim that Ms. Martos "slapped" him. T 734. Tracy Kim concluded that Grievant was not being truthful about the March 30, 2010 incident, "especially, … the part about the transfer, and also about her yelling at him or slapping him," and that Grievant was in violation of disciplinary code section 2.3.8. T 434-435.

Employer's Policy No. 15.01, the Disciplinary Code, provides that "2.3.8 Lying in the course of an any company investigation or inquiry" is a Class III offense. Emp. Ex. 2.

The Class III offense carried with it possible discipline of 10 to 30 days suspension up to suspension pending dismissal. Emp. Ex. 4; Emp. Ex. 2 and T 440. Grievant was assessed the minimum length of suspension, i.e., suspension for ten days, with requirements that he attend one full day of training without pay and mandatory employee assistance program counseling at Straub. Emp. Ex. 4. Mr. Tracy Kim testified that the reason he imposed the minimum 10-day suspension was "we're trying to keep employees working here" and "we don't want to get rid of people. T 440.

The Arbitrator takes judicial notice of the following definitions: Dictionary.com defines "scold" as follows: scold  (verb (used with object)) to find fault with angrily; chide; reprimand. Merriam-Webster's Dictionary defines "scold": (intransitive verb): to find fault noisily or angrily; (transitive verb): to censure severely or angrily: rebuke. Both

dictionaries, consistent with the common usage as known to the arbitrator, add to the notion of censuring behavior by doing so in an angry manner.

The Grievant in his testimony at the arbitration hearing impressed the undersigned as an intelligent young man who would understand the difference between being quietly informed of the correct procedures and being scolded and would understand the difference between a touch on the shoulder when being told good-bye and a slap.

Grievant argued "As to the 'slap' verses 'tap,' the evidence is clear that Mr. Park was startled by Ms. Martos" suggesting that the fact that he was startled could affect his recollection of the touching as a "slap" 5-days later. However, Ms. Martos did not touch his shoulder when she first talked to him, which is when she startled him, but only when she was departing the bus. Grievant had already been startled and had his encounter with Ms. Martos several minutes before he was tapped on his shoulder. It is not plausible that because he was startled at the beginning of their conversation would have converted a "tap" to a "slap" at the end of their conversation.

Furthermore, the arbitration hearing gave the arbitrator the opportunity to assess the credibility of both Ms. Martos and Grievant on the subject of their diametrically opposed statements about the events of March 30, 2010. There was no evidence that Ms. Martos had any motive to make false statements about Grievant's conduct. In fact, she showed restraint in the matter by first calling her supervisor, advising him of what she was observing and asking for instructions. The arbitrator found Ms. Martos credible in her statements in the course of the Employer's investigation and her testimony at the arbitration hearing. The Employer's investigation determined that Grievant was guilty of lying in the course of a company investigation, for which he was disciplined. The finding

of lying in the course of a company investigation inherently carries with it a determination that such statements were intentional. The arbitrator reached the same conclusion.

At the arbitration hearing counsel for the Union raised the issue that Grievant was interviewed five days after the incident and thus his memory of the incident would not have been fresh. However, Grievant's own testimony did not support this argument in significant respects. Grievant testified that he recalled the incident. The only aspect of the incident that he did not recall was with respect to Ms. Martos saying that Grievant had the transfer set at 11:45. He recalled every other aspect of the incident, albeit with dramatically different characterizations of the events from that reported and later described by Ms. Martos during the investigation and during her testimony. Grievant's testimony at the arbitration hearing took place on June 8, 2012 over two years after the March 30, 2010 incident. He did not express any lack of memory about anything but the transfers being set at 11:45.

Mr. Tracy Kim testified that he concluded that Grievant "wasn't being truthful in what occurred on the bus that day with Linda [Martos], especially... the part about the transfer, and also about her yelling at him or slapping him. T 434. Even without considering the issue of the disparity between the statements of Grievant and Ms. Martos as to whether the transfers were cut at 11:45, the other factual issues justified the determination that Grievant was lying in the course of the investigation.

Grievant cited his counsel's skillful cross-examination of Mr. Faufata arguing that when "Mr. Faufata testified that he could not tell if Mr. Park's conduct was intentional or not, Section 2.3.8 stopped applying to Mr. Park." That argument takes Mr. Faufata's

testimony out of context. The context was with respect to the transfer and "whether it was at 11:45 p.m. or whether it was at 5:00 o'clock p.m., if this was Mr. Park's actual recollection five days later when he's first talked about this incident, would he be lying during the course of an investigation if that was his recollection?" T 699. Importantly, Mr. Faufata testified that he conducted his own investigation of this incident in his role as the decision maker in step one of the grievance procedure by talking to Ms. Martos personally. T 592. After doing so he testified that he upheld the grievance because as stated in his letter with respect to the Step 1 Grievance: "I believe Miss Martos' account of what transpired." Joint Ex. 4 and T 595.

The arbitrator finds also that the differences between Grievant and Ms. Martos, including his claim that she was not discrete but was "yelling" at him from the center of the aisle and that she "slapped" him when she left the bus were not a matter of differences in Grievant's recollection.

The arbitrator finds Ms. Martos testimony and reports credible and finds Grievant's reports and testimony not credible with respect to this incident.

### Hotel and Smith Street Incident of December 5, 2010:

Edwin Kim testified that he has been employed by the Company for over 17 years, including 15 years as a bus operator, and is currently a road supervisor, a position that he has held for over 2 years. T 114-115. He is a member of the Union. T 116. He was called by central control to go to an incident involving an intoxicated female boarding a bus, eastbound at Hotel and Smith Streets without showing a proper pass, T 116-117 & 119. This was in December 2010, T 116.

Edwin Kim testified that after he arrived at the bus he learned from Grievant, who was the bus operator, that the intoxicated woman was still on the bus. T 120. He asked Grievant: "So what do you want me to do?" T 120, to which he responded: "I want her off my bus. I called central, I did my job, so you do your job." T 121. He responded to Grievant: "Okay, Scot, calm down. No problem, I will get her off your bus if that's what you want me to do." T 121. Again Grievant stated, "Yes, I did my job, I called central." T 121.

Mr. Ed Kim testified that "And then all of a sudden for some reason, his attitude changed" and that Grievant "looked irritated like he was mad" and then said: "Are you retaliating against me?" T 121. To this, Ed Kim responded: "What are you talking about?" T 121.

Ed Kim testified that he repeated: "I'll get her off your bus if you want me to do" to which Grievant pulled his phone out and said: "You know what, I'm not driving. And why don't you talk to my lawyer." T 122. Ed Kim testified that at this point "all [Grievant] kept saying was, you know… just talk to my lawyer." T 123. See also, Emp. Ex. 6, Ed Kim's incident report in which he reports: "He [Grievant] informed me that he was calling his lawyer."

Ed Kim testified that he "felt intimidated at that point" that Grievant wanted him to talk to his lawyer. T 123. Ed Kim noted that such an incident was "normally a five-to 10-minute response and we get the person off the bus and that would have been it, and he would have been on his way." T 123. He noted that because Grievant was "on the phone saying "talk to my lawyer, talk to my lawyer" the incident was dragged out longer. T 123.

Ed Kim testified: "What would have been a 10-minute resolve turned out to be an almost an hour and a half." T 146.

Ed Kim testified that at this point in the incident he concluded and communicated to central control: "I have a driver here that's... at the point of being insubordinate...." T 123. Ed Kim testified that he asked Grievant to "calm down" but he did not. T 125. He also testified that Grievant kept "coming towards me in an aggressive manner" saying "talk to my lawyer, talk to my lawyer" to the point that Ed Kim "drew back." T 126.

Ed Kim testified that he informed Grievant that he was going to: "relieve" him from duty because of his actions and because Grievant needed to "calm down;" at which time Grievant kept saying: "talk to my lawyer that you're going to suspend me. Talk to my lawyer." T 127. Ed Kim described Grievant aggressively holding his cell phone up to his face causing him to have to back up and informing Grievant to: "...back off away from me because he's getting too close." T 129. He testified that the distance of the phone to his face was approximately two (2) feet. T 129. Ed Kim testified that he felt that he "didn't have the situation under control." T 131.

Ed Kim testified also that this incident was his first encounter with Grievant. T 143.

Ralph Faufata, Jr. testified that he is the Vice-President of Transportation for the Company. He also testified that: "The road supervisor is the direct supervisor of an operator when they're out in the field" and has the authority to remove an operator from a bus. T 581. Policy Number 3.02 expressly states:

> In situations involving insubordination or other types of serious
> violation of procedures, rules or practices by a Bus Operator,
> any Central Radio Controller, Road Supervisor, or Division
> Dispatcher as the authority to relieve a Bus Operator from duty

pending further investigation.

Emp. Ex. 48, p.1.

Similarly, Policy Number 1.04 entitled "Road Supervision Roles and responsibilities" states: "Road Supervisors are the operators' immediate supervisor while in the field…." It also states, "In cases of insubordination or other serious violations, Road Supervisors have the authority to relieve an operator from duty pending investigation of the incident." Union Ex.1.

Road supervisor Rex Paguirigan was called to go to the scene at about 9:40 [p.m.] by central control. T 77. Ed Kim testified that after Mr. Paguirigan arrived Grievant kept repeating to Mr. Paguirigan that Ed Kim was suspending him. T 143. Ed Kim testified that he informed Mr. Paguirigan that he had suspended Grievant because he felt Grievant was "totally out of control." T 144.

Ed Kim testified that he called Ralph Faufata during the incident. After discussing the matter Mr. Faufata told him that if he felt Grievant is calm enough to drive to not suspend him, to see if he will continue on, but that he would leave that to Mr. Kim and Mr. Paguirigan's discretion. T 146. When Ed Kim joined Mr. Paguirigan and Grievant it appeared that Grievant had calmed down, so he informed them about the option of letting Grievant continue to drive the bus. T 147. Ed Kim testified that Grievant agreed to continue, but only after "Rex kept telling him"…"we'll give you the option to continue." T 147-148.

Mr. Paguirigan testified that he is a road supervisor and has worked for the Company for almost 22 years. T 74. He is a Teamsters member. T 76. He was called to

the incident on December 5, 2010 at Hotel and Smith streets to assist road supervisor Ed Kim. T 77.

Mr. Paguirigan testified that he was just trying to resolve the situation. T 81. He spoke with Grievant with Ed Kim present. T 87. Mr. Paguirigan testified that he explained to Grievant that if he could continue driving the bus, the suspension would be reversed and at that Grievant "got all defensive." T 81. Grievant told him: "Oh, you know, let me call my lawyer." T 81. Mr. Paguirigan testified that "it went on back and forth," T 82, and that the discussion "went on for a while." T 87.

Mr. Paguirigan also testified that Grievant's physical demeanor was "not normal" and was "upset." T 83. Mr. Paguirigan prepared a report of the incident on the computer in his car on the same evening. Emp. Ex. 8; T 91-92. In that report, he states that when he and Ed Kim first attempted to give him the option of continuing, "he then got all defensive." Mr. Paguirigan described what he meant by "defensive manner" as "real hostile and real rough." T 93. Grievant was being "aggressive" and that he "couldn't keep still," T 104, and was "antsy" and "moving his head." T 108. He also testified that Grievant was "asking the same question repeatedly." T 108. Mr. Paguirigan also testified that he asked Grievant to "calm down." T 108.

Finally, Mr. Paguirigan brought the discussion to a close by telling Grievant that if he wants the suspension to stand, he would transport him back to the bus facility. Emp. Ex. 8 and T 82. He testified that at that point Grievant mellowed out and made the decision to continue and that as they had offered, the suspension would be withdrawn. T 96. As Mr. Paguirigan reported, he "changed his tone and agreed to continue and finish up his run. Emp. Ex. 8.

Mr. Paguirigan's testimony about Grievant's conduct after he arrived corroborates Ed Kim's testimony about the difficulties he had when he first met with Grievant that evening and corroborate Ed Kim's statement and testimony about Grievant's behavior at the incident.

Grievant testified about the incident on December 5, 2010 regarding the intoxicated female passenger. T 735. He testified that Ed Kim's testimony that Grievant told him he was going to call Grievant's lawyer and that Grievant was saying to him to "talk to my lawyer" did not happen. T 738. Moreover, Grievant testified that he was talking to his wife on his cell phone during the incident. T 739.

On February 8, 2011, Luis Navarro, Jr. Superintendent Transportation-Kalihi conducted an investigation on behalf of the Company. He initiated it based on the reports from the road supervisors. T 465. Mr. Ed Kim's report is Emp. Ex. 6. Mr. Paguirigan's report is Emp. Ex. 8. He then had Grievant give him his own written statement. T 465. Grievant's written statement is Emp. Ex. 9. Mr. Navarro's memorandum of his discussion with Grievant is Emp. Ex. 10.

Mr. Navarro testified that he "looked at the facts through the reports and came to a conclusion." T 465. He did not interview the supervisors. T 465. Grievant was found in violation of GOP 15.01, section 4.2.1 in that his conduct at the scene of the incident determined to have been "offensive toward" a supervisor and issued a "written warning" for the violation and given the option to appeal. Emp. Ex. 10.

Grievant argues that the fact that Mr. Navarro's investigation was based on the written reports of the road supervisors and that he did not interview the road supervisors makes the investigation deficient. The standard for the disciplinary action is "just cause."

There is nothing inherently wrong with basing that determination, as here, on the written report of the incident of the parties involved including Grievant, who in addition to providing a written report to Mr. Navarro was also interviewed by him. Written reports can be more reliable and establish a better record for review than oral interviews. Either may be appropriate. What is required is that the investigation is appropriate to the nature of the case. The use of the written reports of the supervisors was appropriate given the nature of this case, which resulted in a written warning.

The discipline for this incident was appealed. At the Step I stage, Mr. Faufata denied the appeal stating: "Operator Park was given an opportunity to explain his version of what transpired." And, that: "Operator Park's verbal statements were not consistent with his written statements…." Joint Ex. 2.

Mr. Faufata also testified that road supervisors have the authority to remove an operator for insubordination or violation of a rule; and, further that road supervisors use the term suspend when they are removing or relieving an operator. T 582. He also testified that in his experience the word "suspend" is used more often in such situations. T 582.

The fact that the matter of removing an intoxicated passenger would typically take five to ten minutes and that this event took nearly an hour and a half, reveals the extent of inappropriate conduct on the part of Grievant in this incident and supports the finding that discipline was warranted.

Grievant raised the issue of the fact that his being "relieved" of the operation of the bus, as he was first told, was subsequently characterized at the scene as a "suspension." Even if the use of the term "suspension" for the action taken by the road

supervisor was not appropriate, it was no justification for Grievant to make what would have been a five to ten minute incident to resolve into one that took nearly an hour and a half. Indeed, the intersection of Hotel and Smith Street was not the appropriate place to resolve any concern Grievant may have had about whether his supervisor was using the correct terminology when relieving him. In this regard, if a subsequent investigation established that the operator should not have been relieved or suspended, Mr. Faufata testified that if loss of pay were involved, the employee would be made whole. T 586.

Furthermore, as discussed above the arbitrator finds that Grievant did tell Ed Kim that he had his lawyer on the phone and that he repeatedly demanded with his words and gestures that Ed Kim talk to his lawyer by phone at the scene. Grievant admitted that the person on the phone was not his lawyer but his wife. This supports the conclusion that not only was Grievant's conduct offensive toward his supervisor, it was intentionally so.

As to credibility, the arbitrator finds that as to the contradictions between the statements and testimony of Grievant and those of Ed Kim and Mr. Paguirigan, that Ed Kim and Mr. Paguirigan were credible and the Grievant was not.

**Major Accident Incident March 26, 2011:**

Mr. Adam Fraga testified that he has been a transit supervisor for almost three years and that he is a member of the Union. T 206-207. He was a bus operator for almost four years and has been with the Company for almost 12 years. T 207. On March 26, 2011 he was called by central control to assist in an accident investigation involving Grievant, Scot Park. T 207. He was the "primary" supervisor on the scene, responsible for securing the scene and making a report. T 208.

Mr. Fraga testified that he spoke to both passengers, who he assumed were husband and wife, at the same time. T 211. "They said they boarded the bus, the bus started proceeding, and then braked all of a sudden and then she fell." T 210. He testified that "they didn't say anything about sitting down" and that the husband "mentioned that the driver was driving safely." T 212.

Mr. Fraga also testified that he spoke to Grievant who told him: "As he was about to leave, a silver or gray colored car cut him off, and he had to step on the brake -- apply the brake… coming to an abrupt stop." T 212. Employer's Exhibit 13, pages 1 through 7 is the report he prepared. T 214-215. It includes the information he obtained from the Grievant and the male and female passengers. T 215. Page 7 of the report is a photo with a circle indicating the area where the husband told him his wife fell. T 216.

At the scene, Mr. Fraga asked Grievant to prepare a written report but he refused, but said he would do so at the office. T 224. Grievant did not prepare his written statement of the circumstances of the accident until April 7, 2011, 12 days after the accident. Emp. Ex. 14. It was considered a "major" accident because someone was transported to a hospital with injuries. T 226-227. Mr. Fraga tested the brakes, as is standard procedure in the process of such an investigation, T 230 and Emp. Ex. 13, p.1.

A second road supervisor, Ed Kim, came to the scene to assist Mr. Fraga by taking measurements and photographs and preparing an accident diagram. T 233. Mr. Kim testified that his role was to take photographs and prepare what is now page 024 of Employer Ex. 13, which is a diagram with measurements of the scene of the accident. T 167-168.

Mr. Luis Navarro, identified above as Superintendent Transportation-Kalihi, testified that he was on the accident committee with respect to the accident involving Grievant servicing a bus stop on Kalakaua Ave. T 470-471. He testified that the committee reviewed the statements from the passengers, the police reports, the statement from Grievant and the road supervisors' reports. T 471.

Mr. Navarro testified that the accident committee was made up of three voting members and a chairperson. Of the three members, two are managers and one is a member of the Union. T 472. All three members voted that the accident was "preventable." T 474 and Emp. Ex. 22. The "recommended disciplinary action was 10 to 30 days up to suspension pending dismissal." Emp. Ex. 23. Mr. Navarro testified that he met with Grievant on May 31, 2011 and advised him of the committee's finding that the accident was "preventable" and of the committee's recommended disciplinary action. Emp. Ex. 23. At this meeting, Grievant "stated this accident should be non-preventable, but could not give a reason as to why it should be non-preventable." Emp. Ex. 23.

James Kaonohi, III testified that he is a road supervisor and a member of the Union, with about 17 years experience as a bus operator. T 247-248. He is the Union's representative on the Major Accident Committee ("MAC"). T 250. He testified that the purpose of the committee is "to fairly give the... operator a chance... to have an outside opinion or view of the accidents and the evidence that has been presented. T 251. With respect to Grievant's accident, he reviewed the file which he identified as now marked as Emp. Ex. 13. T 252. At the MAC the chairman asked if everyone had adequate time to review the case and if there were any questions or discussion prior to the vote. T 254. The vote of the MAC was unanimous that it was a "preventable" accident. T 254.

Mr. Kaonohi testified that as operators they are taught that for "those [passengers] that are elderly and those that have things in their hands to wait until they get a seat before you proceed." T 262. Mr. Kaonohi testified significantly that based on their training an operator should observe whether a vehicle in the next lane is to the far left or to the far right as an indicator whether they will possibly swerve into the bus's lane. T 289.

The woman who fell on the bus was Italia Grasso, born January 21, 1938, and, therefore, was 73 years of age at the time of the accident. Emp. Ex. 13, p.2.

Mr. Faufata testified that as the Vice-President of Transportation he is responsible for the on-street operations and the employees that provide those services. T 562. He was a bus operator in the first 17 years of his 34 years with the Company and was a trainer for seven or eight years. T 562. He testified that the Company's number one priority is safety, followed closely by customer service. T 567.

Mr. Faufata testified that he reviews every accident in the transportation department and that the "vast majority of people who fall on our busses are elderly people." T 569. Such on-board accidents are a focus of all operator training so that operators "do whatever they can to minimize" or-board accidents. T 569. Mr. Faufata also testified that "easily 80-plus percent... of on-board accidents involve elderly passengers." T 569.

Mr. Faufata identified two slides from the refresher training, Emp. Ex. 49 and 50. T 570. Slide 81, Emp. Ex. 50 states "Departing Bus Stops, Scan Interior, Passengers are Seated Or Secured, Especially the Elderly & Disabled." Mr. Faufata testified that the text at the bottom of the slide is what is read aloud by the instructor: "Departing Bus Stops:

Before departing, be sure to scan the interior of the bus to ensure that passengers are seated or have a firm grip especially the elderly and disabled." T 571-572.

Training slide 82, Emp. Ex. 49, states: "Departing Bus Stops, Scan Mirrors Before Pulling Out, Be Alert to Approaching Vehicles That May Cut In Front of Your Bus" with text below that is read upon showing the slide that states: "Departing Bus Stops, Also check your exterior mirrors for any approaching vehicles. Many times motorists will assume that a stopped bus will not move, be alert for approaching vehicles that may cut in front of your bus." Emp. Ex. 49. T 570.

Mr. Faufata also testified that the company policies regarding the boarding of passengers, Policy Number 12.04, Emp. Ex. 47, and Policy Number 6.11, Emp. Ex. 46. T 574.

Policy Number 6.11 states in pertinent part:

> B. Exiting Bus Stops... 3. Scan the interior rearview mirror to be sure any frail or elderly passengers are seated or stabilized. ...6. DO NOT MOVE THE BUS UNTIL YOU HAVE CHECKED THE BLIND SPOT TO THE LEFT OF THE BUS AND ARE AGAIN SCANNING THE LEFT OUTSIDE REARVIEW MIRROR, MAKING SURE IT IS SAFE TO PROCEED. 7. Be especially careful of vehicles attempting to pass then cut in front of your bus.

Emp. Ex. 46, p. 2.

Mr. Faufata testified that the busses are equipped on each side with a flat mirror and convex mirrors, which allow an operator to see the blind spot to the left of the bus [from the driver's position]. T 577.

Policy Number 12.04 states in pertinent part: "Do not assume all senior citizens or persons with disabilities are frail. However, if a passenger is obviously frail or physically unstable, Bus Operators should not move the bus until the passenger is safely seated or is

securely settled as a standee. If priority seats are available, wait until the passenger is

seated in the priority seat area before proceeding." Emp. Ex. 47.

Policy Number 12.04 continues with detailed and somewhat elaborate instructions

for actions an operator should take in the event seats are not available for the frail or

physically unstable. Since the bus was at or near empty, the continuing instructions were

not applicable in this incident. Nevertheless, what those additional instructions do convey

is the Company's requirements for efforts they expect of bus operators to address the

problem of frail or physically unstable passengers. Emp. Ex. 47.

The police report was included in Emp. Ex. 13 which was, as stated above, was

what was reviewed by the Major Accident Committee and the basis of the discipline

imposed on Grievant because of the accident. Grievant wrote a handwritten statement

included in the police report, which in turn was included in the report considered by the

MAC. Emp. Ex. 13. There Grievant stated: "I saw them [Mr. and Mrs. Ganley/Grasso] sit

down [and] … when the light turned green I scanned left & right and car RGN 150 cut

me off and came out of nowhere. I gradually pressed the brake to come to a complete

stop during that the woman fell after sitting down [and then] changing seats." Emp. Ex.

13.

At the arbitration hearing Grievant testified regarding this accident that he

serviced the bus stop at Kalakaua and Makaloa Streets heading toward Waikiki. T 740.

He picked up the couple and noticed that the woman was a "heavyset female" who

weighed "approximately 230 pounds" and "5'8 or 5'9" but she did not "look elderly" to

him. T 740-741. Grievant testified that he "waited for them to sit down." T 741. He

testified that he was stopped when the light turned green and that he "scanned" and

looked forward and as he "proceeded to go there was a vehicle that came and cut me off from my left side." T 743. He testified further that: "the vehicle came out of nowhere and cut in front of my bus." T 743. Grievant also testified that he had a clear recollection that the female passenger had actually sat down. T 744.

In the statement hand written by the husband, John Ganley, in the police report he wrote: "I entered bus #934 route 13 with my wife, Italia Grasso/Ganley. We were both standing. The bus moved forward at a normal speed and within a matter of seconds the bus driver slammed on the brakes. I saw my wife violently slammed to the floor of the bus...." His statement continues: "My wife and I did not sit down at any time during this incident." Emp. Ex. 13. In addition, the police report includes an oral statement of the wife, Italia Grasso, who appeared to the officer sober and coherent. Emp. Ex. 13. Ms. Grasso stated that "she took about three (3) steps towards the rear of the bus from the bus entry, the bus suddenly braked really hard causing her to fall to the ground." Emp. Ex. 13.

The statement by Grievant contradicts the separate statements by Mr. Ganley and his wife on the important issue of whether the couple had sat down in bus seats.

Grievant objected to the statements by the couple as contained in the police report as hearsay. Grievant maintains that the "failure to call a witness who is available to a party gives rise to a presumption that the testimony of the witness would be adverse to the position of the party having the ability to call that witness," quoting *Southern California Permanente Medical Group*, 92 LA 41 (1989) and citing other arbitration decisions asserting that principle in several different contexts. The undersigned has read

each of those authorities, which in the opinion of the undersigned are distinguishable

from the instant case.

A most comprehensive and cogent articulation of the rule espoused by Grievant

can be found as articulated by the Supreme Court of Virginia:

> The essential elements of the rule, which must be supported by the evidence
> to justify an instruction thereon, are availability and materiality of the
> witness. ***Availability may be translated as the power of the party to
> produce.*** 2 Wigmore on Evidence § 286 at 166 (3rd ed. 1940) (hereinafter
> cited as Wigmore). Probable availability rather than actual availability may
> be sufficient depending upon the state of the evidence in each case. *Grady v.
> Collins Transportation Company,* 341 Mass. 502, 506, 170 N.E.2d 725, 727
> (1960). The lack of power or nonavailability may be due to the person's
> absence from the jurisdiction, his illness, the party's ignorance of the
> whereabouts of the witness, the person's testimony being inadmissible, or
> other like circumstances. Wigmore, § 286 at 166. *E.g., One Inter'n'l Truck v.
> Commonwealth,* 159 Va. 1010, 1013, 167 S.E. 376, 377 (1933) (inference
> not applicable when witness out of jurisdiction and prevented from
> attending trial by a death in his family). *'Available' is equated to 'control'
> in some cases, that is, the witness is available if he 'is in such relationship
> with the party that it is likely that his presence could be procured.'* *Grady
> v. Collins Transportation Company, Supra, 341 Mass. at 505,* 170 N.E.2d at
> 726. Nonavailability may be explained and the inference, or presumption,
> rebutted when the litigant explains the absence. *McGehee v. Perkins,* 188
> Va. 116, 126, 49 S.E.2d 304 (1948). ***Moreover, when the person is equally
> available to both parties, 'the failure to produce is Open to an inference
> Against both parties, the particular strength of the inference against either
> depending' on the facts and circumstances of each case.*** Wigmore, § 288
> at 169--71. (emphasis added).

*Neeley v. Johnson,* 211 S.E.2d 100, 215 Va. 565 (Va. 1975).

On the issue of the presumption, the Ninth Circuit similarly requires that the

record establish that the witness be "peculiarly within the party's control." *United States
v. Noah,* 475 F.2d 688 (9th Cir. 1973) ("The failure of a party to produce a material

witness who could elucidate matters under investigation gives rise to a presumption that

the testimony of that witness would be unfavorable to that party *if the witness is
peculiarly within the party's control.*").

Similarly here, in view of the pre-hearing discovery, there is no indication in the record that the couple, Mr. Ganley or Ms. Grasso, were uniquely available to the Employer or indeed available at all.

Appropriate to the nature of the case, the arbitrator takes into consideration that the foregoing statements by Mr. Ganley and Ms. Grasso are hearsay and that Grievant's counsel did not have the opportunity to cross-examine either of them. There is nothing in the record relied upon by the Employer in the course of imposing discipline, other than the contradictions contained only in Grievant's own statements, that suggests that the hearsay statements are unreliable. A close examination of the conflicting statements and a determination of credibility is appropriate.

The factors suggesting that the passenger's statement should be believed over that of Grievant's include the following: 1) Grievant's self-interest in making the contradicting statement that he saw the couple sit down; 2) the inherent implausibility that a 73 year old woman with the physical attributes of Ms. Grasso would leave a seat while the bus is leaving or soon leaving a stop to move to another seat that had been already available when she would have been selecting her first seat since the bus was otherwise empty or near empty; 3) Grievant's statement that he scanned to the left and nevertheless the car that cut him off "came out of nowhere" which indicates that he wasn't looking or was looking but was inattentive; 4) that he "gradually" pressed the brake; and 5) that she undisputedly "fell violently" to the extent that she was required to be transported to a hospital.

The arbitrator's own assessment on the issue would include the finding of Grievant's lack of credibility in his statement and testimony with respect to this accident

as well as the finding of his lack of credibility on the other matters as described elsewhere in this decision. In addition, the arbitrator notes that it is implausible that a 5'8 or 5'9, 230 pound woman aged 73 years would not appear "elderly" to an operator.

Counsel for Grievant skillfully made the argument that the car that cut Grievant off was observed by Grievant several bus lengths behind the bus when Grievant "scanned" to the left of the bus but could suddenly "come out of nowhere" because a car traveling at 44 feet per second would reach the front of the bus in 2 seconds. The bus driven by Grievant at the time of the accident was bus 934, which is 40 feet long. Emp. Ex. 15.  However, this argument fails to take into consideration that Grievant reported that he saw the car that cut him off "stopped" and that "there was not vehicles to my left as the vehicles to my left was three bus lengths behind" as reported by Grievant in his "Fleet Accident/Incident Employee Report" that he prepared on April 7, 2011. Emp. Ex. 14. A car coming to a complete stop in the front of a bus would not be traveling at 44 feet per second for the entire distance from 3 or even 2 bus lengths back to the front of the bus. To come to a complete stop, the car would have to be at some point decelerating significantly in order to do so, thus taking significantly more that 2 seconds to travel that distance.

The position of the bus in the photographs in Mr. Fraga's report show that the bus came to rest at an angle to the lane markers indicating that as he came to a stop Grievant swerved to the right to avoid a collision with the car that swerved in front of him. Emp. Ex. 13, pp. 3, 4 and 6. This suggests that Grievant suddenly not "gradually" pressed on the brakes as he reported in this written statement in the police report.

Based on the foregoing as well as the undersigned determination of Grievant's lack of credibility in his testimony contradicting other witnesses with respect to other incidents, the undersigned finds that the Grievant's testimony that the elderly couple was seated and that he scanned the left side of the bus and blind spot immediately before he put the bus in motion is not credible.

**Canadian Coin Incident May 15, 2011:**

Luis C. Navarro, Jr. testified that he became aware of an incident involving Grievant and a Canadian passenger through a customer service report. T 481. The report states in brief that the complainant and his friend were Canadian tourists who on May 14, 2011 boarded bus number 520 at the Ala Moana stop; that his friend paid $2.50 USD and used an American one dollar coin which he described as a gold coin by including the U.S. Mint's website address, which website reveals that there is a gold U.S. one dollar coin. Emp. Ex. 25. Complainant reported that: "The driver immediately and rudely accused my friend of putting in a Canadian one dollar coin, saying words to the effect: 'You tried to cheat your fare." Complainant then stated that the driver: "immediately threatened to call the police." The Complainant referred to the driver's: "multiple threats to call the police" and "extreme rudeness." Emp. Ex. 25.

Interestingly, in Complainant's report he said that the driver rejected their explanation as to why it was not a Canadian coin and stated: "I asked him to listen to us again whereupon he, even more rudely that before, threatened to call the police saying something like "I can call the police and we can open up the fare box and I guarantee you that you'll find Canadian money." Emp. Ex. 25. Opening the fare box should not be necessary since the fare boxes allow the operators to manually stop the coins from

dropping so the operator can show the passenger the coins the passenger deposited. T 544. This permits an operator to ask the passenger to look at the coin that they deposited. T 544. Grievant did not indicate that he did this during Mr. Navarro's investigation. T 544.

After Mr. Navarro received the report he conducted an investigation of the incident. T 482. He interviewed Grievant about the allegations in the customer service report and wrote down Grievant's statements and then corresponded with the complainant and gathered information. T 482. At the time of his interview, Grievant remembered the incident and said: "a gentleman boarded the bus and deposited a Canadian coin and he questioned the passenger about the coin." T 482. The customer insisted that it was an American coin and Grievant insisted that it was a Canadian coin. T 482. Grievant told Mr. Navarro that he felt he did not do anything wrong and that he was following company policy. T 484. Navarro testified that during the interview Grievant "was saying that I'm favoring the complainant" and that I was "retaliating against him." T 484.

After interviewing Grievant Mr. Navarro corresponded with the complainant. T 484. The complainant again said that the operator was threatening to call the police and offensive. T 485. The complainant again stated that: "The driver immediately and rudely accused my friend of putting a Canadian one dollar coin, saying words to the effect of 'You tried to cheat your fare.'" Emp. Ex. 26. Mr. Navarro testified that the company policy in dealing with a situation like this incident was that it was the operator's duty to question passengers regarding the fares, but that if there is some doubt, to give the passenger the benefit of the doubt. T 485. The purpose of the policy of giving the

passenger the benefit of the doubt is to "avoid any type of confrontation." T 486. Bus

operators are trained to avoid this type of confrontation. T 486.

The "Inquiry on City Bus Service," Emp. Ex. 25 sets forth the initial complaint in

writing regarding this incident as well as Mr. Navarro's report of his interview of

Grievant on the matter. Mr. Navarro's report of his interview with Grievant states that

Grievant denied: "threatening the complainant or his partner in any way." It reports then

that Grievant accused Mr. Navarro of "retaliating against him" and that when asked "why

do you fell that I've already made a decision on the complaint." Grievant responded that

Mr. Navarro "sided with the complainants in the past so it must be that I'm siding with

them again." Mr. Navarro told Grievant that a decision is not rendered until all the facts

are gathered." Emp. Ex. 25.

Mr. Navarro testified that after conducting his investigation he determined that

Grievant's conduct was "offensive and threatening to a member of the public." T 487.

Mr. Navarro noted with his decision that: "Operator Park has had other incidents of this

nature, primarily complaints for his offensive conduct and threatening language where

discipline was assessed." Emp. Ex. 25.

Grievant, a bus operator for almost four years, testified at the arbitration hearing

with respect to the incident with the Canadian passengers. T 732-733. He clearly recalled

the incident and testified that after a customer tossed coins in: "I noticed that one of the

coins were gold." T 745. He also testified that he "noticed it said Canada." T 745. He

then testified that he "politely" told the passenger: "we don't accept foreign currency." T

745. Grievant testified that: "the gentleman started getting really upset" and that he: "did

not calm down" and "kept on saying that it was the hotel's fault, that the hotel gave him

the wrong change." T 745. Grievant testified that he told the customer: "just calm down," T 746, and "it's no big deal. Just can we move on." T 747. He testified that he did tell them that he was going to call central control. T 746. But he denied that he threatened to call the police, T 747. Grievant testified that he did show the passenger the gold coin. T 794. Yet, he also testified that he did not manually stop the gold coin from dropping into the box and that he is unaware that the fare box is capable of stopping the deposit through a manual switch. T 794.

In considering the statements provided by the complainant the arbitrator recognizes that they are hearsay and thus not necessarily due the weight such statements would be given if they were subject to cross-examination.

For the reasons given above with respect to the major accident, the record does not support the application of a presumption that the testimony of the complainant or his friend would not support the Employer's case due to the fact that they were not called to testify at the arbitration hearing. Specifically, the record does not show that they were available to testify at the hearing.

In addition, it is appropriate to the nature of the case that the Employer, which provides bus service throughout Honolulu that is used by both residents and visitors from outside of Hawaii alike, that it may impose discipline based on written complaints and correspondence as opposed to a personal interview. In the circumstances of this case, written statements and correspondence are likely more reliable than a telephone interview. Written statements leave no doubt as to what a party reported as it is memorialized in writing.

Grievant argues that the evidence is insufficient to prove that the person who wrote the emails "had any personal knowledge of the events described in the email." What Grievant's argument fails to recognize is that Grievant in his own testimony testified to the incident. Based on Grievant's testimony it is clear that while Grievant's and the complainant's recitation of the events differ in significant respects, they both are addressing the same incident. From this it is sufficiently clear for the purposes of such a disciplinary action for the employer to conclude, as does the arbitrator, that the author of the emails had personal knowledge of the incident.

The arbitrator finds that Grievant does not claim that the incident did not occur but denies such details of the complaint such as repeatedly threatening the customer with calling the police and being rude. As to the description of the incident by the complainant the arbitrator finds that the company's conclusion about the validity of the complaint is supported, among other things, by Grievant's unfounded accusations against Mr. Navarro during his interview.

As to the arbitrator's own findings on this matter, the customer does not appear to have any motive to misrepresent the incident. While Grievant testified that he could see the word Canada" on the coin, he did not manually prevent the coin from dropping leaving no doubt to the customers, including, if called, the police, or a road supervisor or anyone else whether it was a Canadian coin or a U.S. coin. Grievant was trained to manually stop the coins from dropping yet he testified that he was unaware of that. Grievant has been a bus operator for almost four years. As a bus operator he has for years taken fares deposited in the fare box, which is not a complex device, situated next to him while he has been operating a bus. Yet implausibly he testified that he does not know that

there is a button on the fare box that stops the change so that it can be observed without it falling into the bottom of the fare box.

In addition, the circumstances and events as described by the complainant with respect to this incident and repeated threats to call the police bring to mind the repeated threatening statements involving the incident at Hotel and Smith Streets.

Taking all of the circumstances related above with respect to this incident into consideration leads the undersigned to the conclusion that relying on Grievant's statements and testimony with respect to this incident is unfounded. In short, the arbitrator finds that the events as related by the complainant are more credible than those as related by the Grievant.

### Pearl City Facility Incident November 29, 2011:

Grievant submitted a handwritten statement to the Company on the morning of November 29, 2011 regarding an early morning incident at the Pearl City facility that stated:

> On 11-29-11 at 4:00 am I used the bathroom after I used the bathroom Kevin Holu was sitting at table started to swear and call me you fucka, I kill you, you fucka, I could see that I was the one targeted through the reflecting off the window as I was walking out, as I turned to my right he kept saying and looking at me. I made sure that he was looking at me because I looked around and nobody was around me outside, so I called 911 and then Kevin came hurrying out saying you fucka what why you when call the cops you fucka. Then he said _____ I get choke witnesses apparently there was only him and I in the break room. I am scared for my life and I want this to stop.

> Emp. Ex. 31, p.1.

The following day, Grievant submitted to the Company a signed typed statement that stated:

On Tue., 11/29/11 at around 4:00 a.m. I walked in to the Pearl City break room to use the restroom. After using the restroom I noticed Operator Kevin Holu sitting on the table nearest to the vending machines. He started swearing at me and telling me that he was going to kick my a---. I kept walking while at the same time I noticed from the reflection of the glass window that everything said was being directed at me. I also noticed him nodding his head as he continued taunting me. I walked out the door and I picked up my cell phone to call 911 as I felt my life was in danger and he was not going to stop harassing me. While on the phone Kevin came out toward me and starting swearing at me. I did not say anything to him. He then went to Dispatch and began screaming to Barbara claiming that I was swearing at him and harassing him. I met HPD officer at the entrance to the parking lot. The HPD officer asked me if I was okay. I told her that I was fine and that I did not get hit. She then informed me to follow up with a TRO which I did.

Emp. Ex. 31, p.2.

From both statements it is clear that the alleged swearing by Kevin Holu at

Grievant occurred as he was passing through the break room and exiting the double

doors.

Mr. Holu was interviewed as he was the subject of the allegations by Grievant and

gave the following typewritten statement which is set forth in pertinent part:

On Tuesday, 11/29/11, at 3:55am, I walked into the Operators' Lounge and sat on the round table nearest the vending machines.... Sitting on another table to my left was Operator Roy Shindo, who I greeted with a "Good morning". I [read my newspaper and drank my coffee]. I heard the makai doors open so I looked up and noticed Operator Scot Park looking back towards me in a menacing manner as if "calling me out" as he exited the lounge. I immediately looked away to avoid any eye contact with him by looking at the tv and then returned reading my paper. I could feel as if someone was watching me, so I looked back up towards the tv and through the corner of my eye, noticed Operator Park was now standing on the outside peering in from an area of the window approximately 3 to 4 inches wide. He was up close to the window, practically touching the glass with his face, staring at me. I turned to Operator Shindo who was now walking towards the makai door and nearing the end of the bulletin board when I asked if he saw Operator Park staring at me. He said he couldn't because of the glare of the glass. I resumed reading my paper trying to brush off what was happening. I kept having that feeling of being watched when I looked up again and noticed Operator Park was now standing outside with one foot

on the table, holding his cell phone nodding his head in a taunting manner. I then stood up and immediately walked to Dispatch to inform them of the situation and that Operator Park was harassing me. As I exited the lounge through the makai doors, I noticed Operator Park approaching me from the right. I totally and completely ignored him, not saying a word or even looking toward his direction. I then opened the Dispatch door and told Dispatcher Barbara Autenorieth that Operator Park was harassing me. Operator Park followed me into the Dispatch Office and said that I was provoking a fight, to which I replied he was lying and did nothing at all.

Emp. Ex. 32.

Mr. Faufata testified that after learning of the allegations against Mr. Holu they examined the video only security camera recordings taken around the time of the incident and identified the others who were in or around the break room at that time. T 608-609. The Company interviewed the individuals that they could identify as being in or near the break room at the time of the incident. T 609.

Operator Roy Shindo gave a signed statement on November 29, 2011 which is set forth in pertinent part below:

On Tue. 11/29/11 at approximately 3:50am, I was sitting at the second table from the Men's restroom in the Operator's lounge. I noticed Operator Scott Park passed behind me and walked out the door across from Dispatcher. I observed Operator Kevin Holu reading the newspaper then looked out the window while sitting at the table next to the Vending machine. I overheard Operator Holu say out loud, "He's (Operator Park) doing it again, staring at me". Prior to that, there were no words between Operator Holu and Operator Park.

Emp. Ex. 36.

Operator Marshall Quartero, Jr. gave a signed statement on November 29, 2011, which states in pertinent part:

On Tuesday, 11/29/11 I reported at 3:50am to Dispatch as scheduled... Operator Holu and I both walked out of Dispatch and headed to the Operators' Lounge. After entering the lounge, Operator Holu went to sit on

the table nearest the vending machines near the mauka door, and I stopped to look at the duty runs on the bulletin board on my way to the restroom. As I left the bulletin board to go to the restroom, I noticed Operator Park was behind me and we entered together. I went to the lockers as Operator [Park] went towards the restroom; I grabbed my belongings from my locker and left soon after with Operator Park behind me as I exited the room. I walked through the middle of the lounge and I noticed Operator Park had gone into the Computer Room. I then exited the lounge through the makai door to read posted detour bulletins and as I finished reading, I noticed Operator Park walk by me headed toward the bus area. I was now walking behind him on the sidewalk area between the grassy areas headed toward the busses when he suddenly slowed down and started looking into the lounge. I turned around to look at what he was looking at and noticed it was Operator Holu. Operator Park then stops and turns around and walks toward the window, stops, and then began staring at Operator Holu who was just sitting at the table reading down at a newspaper. Operator Holu looked up from the newspaper when Operator Park walked back toward the lounge and stopped at the corner near the ATM, staring into the lounge at Operator Holu, nodding his head up and down in a menacing manner as if to provoke a fight. I continued down the path but was watching everything and noticed Operator Holu stand up from the table and headed towards the makai door. As he walked out the door towards the Dispatch office, Operator Park began to walk in the same direction as Operator Holu. I thought there would have been a confrontation by the way Operator Park's demeanor and body language, however, Operator Holu totally ignored Operator Park, not saying a word or even looking at him in his direction. Operator Holu opened the Dispatch door and from where I was standing, could clearly hear him say, "This guy harassing me", as he pointed to Operator Park who was now on his cell phone. I soon left the area as I needed to start my first portion of the day.

Emp. Ex. 35.


Operator Kevin Lee gave a typewritten signed statement about the "Incident dated

Tuesday, 11/29/11 which states as follows:

On Tuesday, 11/29/11, at approximately 4:07am, I entered the Operators' Lounge and noticed Operator Kevin Holu sitting on the table nearest the vending machines. I also noticed Operator Scot Park was standing near the makai door and then exited. I went to sit down at the table nearest the men's restroom and began arranging my lunch box. Although I wasn't paying full attention and minding my own business, I am absolutely certain there was no interaction between Operators Holu and Park whatsoever during the entire time I was there.

Emp. Ex. 39.

After conducting its investigation as described above the Company concluded that Grievant violated Company policy violations, specifically Class III Offenses 2.3.5 and 2.3.8, and inclusive of but not limited to, an overall unsatisfactory work record and effective December 1, 2011 suspended Grievant pending dismissal. Joint Ex. 1. Thereafter, with the consent of Grievant, Joint Ex. 7, the Union requested a Job Security Committee review of the discipline and made Grievant's records available to the Union, Joint Ex. 2. The Job Security Committee's vote was a deadlock and thereafter the matter went to arbitration. Joint Ex. 8.

At the arbitration hearing Mr. Holu, Mr. Lee, Mr. Shindo, Mr. Quartero and Mr. Kevin Lee testified. Their testimony was consistent with their statements set forth above. Other witnesses testified but their observations were not directly material to the determination of the interactions between Grievant and Mr. Holu at the Pearl City bus facility on the early morning of November 29, 2011.

Grievant testified at the hearing with respect to the Pearl City facility incident as well. T 747 et seq. He testified that as he was coming out of the bathroom into the room where Mr. Holu was seated at a table, "he started to call me the F and P word." T 747. He also testified that Mr. Holu was "swearing at me telling me F you, F you, you know, kick you're a-s-s" and "He kept on calling me an f'ing P, the P word." T 747.

Grievant quoted Mr. Holu's alleged "swearing" at him was notably different in each of his statement of November 29, 2011, his statement of November 30, 2011 and his testimony. Furthermore, Grievant's statement of November 29, the date of the Pearl City facility incident, in his application for a TRO against Mr. Holu gives yet another version

of Mr. Holu's alleged swearing. Changing stories on something so central to the issue do not inspire findings of credibility.

Furthermore Grievant's version of events is materially contradicted by the witnesses and their statements quoted at length above. Importantly, Mr. Shindo and Mr. Lee, witnesses who were in the operators' lounge at the time Grievant left through the double doors did not hear Mr. Holu say anything to Grievant.

Moreover, Mr. Quartero stated that he observed Grievant outside the lounge "nodding his head up and down in a menacing matter as if to provoke a fight" as he was looking through the operators' lounge window at Mr. Holu. So, the only aggressive behavior by anyone reported by someone other than Grievant and Mr. Holu was the aggressive behavior of Grievant "nodding," "menacing," "as if to provoke a fight. Tellingly, Mr. Quartero reported that as Mr. Holulu walked out of the lounge toward the Dispatch office, Grievant "began to walk in the same direction." Emp. Ex. 35. If Mr. Holu made Grievant "scared for his life" as he reported in his first handwritten statement, Emp. Ex. 31, and his TRO statement, Emp. Ex. 42, he would not walk towards Mr. Holu but away from him and wait for the police.

Add to the above, Mr. Holu's denial that he said anything to Grievant. And further as reported by Mr. Quaartero he: "thought there would have been a confrontation" because Grievant was following Mr. Holu and by Grievant's "demeanor and body language' yet "Operator Holu totally ignored [Grievant], not saying a word to him or even looking at him or in his direction." Mr. Quartero establishes: 1) that Grievant's behavior was aggressive, and 2) Mr. Holu's behavior was no-confrontational. This supports Mr. Holu's credibility.

Grievant makes the argument that he did not intend to make a false accusation simply because his honest recollection is that Mr. Holu did taunt and swear at him as he described even if it didn't actually happen. There is nothing in the record that supports this argument sufficient to persuade the arbitrator that Grievant made the allegations against Mr. Holu but somehow didn't know that what he was describing didn't actually happen and therefore he was not "lying." As stated above Grievant in his testimony at the arbitration hearing impressed the undersigned as an intelligent young man. He was observed throughout the hearing as alert to his circumstances and he was certainly responsive to the questions by counsel on both direct and cross-examination. There is simply nothing in the record that supports Grievant's argument other than the fact that Grievant's statements are not true as demonstrated by the statements of the others who were present. This alone is insufficient to support this argument.

As to Grievant's allegations against Mr. Holu on November 29, 2011 the arbitrator finds that his testimony is not credible.

## Conclusions of Law

The Arbitrator's role is as a creature of the CBA between the Hawaii Teamsters and Allied Workers, Local 996 and Oahu Transit Services, Inc. The Arbitrator's authority, granted to the undersigned by the parties to decide the instant dispute, flows from and is limited by the CBA. The Arbitrator in considering a grievance is to interpret the contract, and if necessary, resolve any ambiguities in the process of interpretation. The CBA expressly provides that "the arbitrator shall have no power to alter, amend, nullify, add to, or subtract" from the express language of the CBA.

### Transfer Incident of March 30, 2010:

The Employer had just cause to discipline Grievant with a ten day suspension, attend one day of training and EAP counseling for violation of policy 2.3.8 based on Mr. Tracy Kim's conclusion that Grievant was not being truthful in the investigation of Grievant's encounter with Ms. Martos.

### Hotel and Smith Street Incident of December 5, 2010:

The Employer had just cause to discipline Grievant with a "written warning" for violation of GOP 15.01, section 4.2.1 concluding that Grievant's conduct at the scene of the incident to have been "offensive toward" a road supervisor.

### Major Accident Incident March 26, 2011:

The Employer had just cause to determine that the accident was "preventable" and discipline Grievant with a thirty-day suspension.

### Canadian Coin Incident May 15, 2011:

The Employer had just cause to discipline Grievant with a ten-day suspension and mandatory Express Refresher Training-Module B for using abusive, offensive conduct, or threatening language toward…a member of the public.

### Pearl City Facility Incident November 29, 2011:

The Employer had just cause to discipline Grievant with a Suspension Pending Dismissal for policy violations 2.3.5 and 2.3.8 for "making false, vicious, or malicious statements which slander or defame … employees" and for "lying in the course of any company investigation or inquiry," "and inclusive of but not limited to, an overall unsatisfactory work record."

## AWARD

For the foregoing reasons the Arbitrator finds that the Grievances, asserted in

DPR No. 12-0056-A, are DENIED.


Dated: October 22, 2012

Daniel Bent
Arbitrator

STATE OF HAWAII                    )
                                   )     SS.
CITY AND COUNTY OF HONOLULU        )


On the 22nd day of October 2012, before me personally appeared Daniel Bent to me

known to be the person described in and who executed the foregoing Arbitration Decision

and Award, and acknowledged that he executed the same as his free act and deed.


WITNESS my hand and official seal.

Printed:  Debra L. Nishimura
Notary Public
My Commission Expires:  October 12, 2015


Doc Date  Oct. 22, 2012      # Pages  40
Debra L  Nishimura         1st  Circuit
Doc Description  Decision
and Award

Notary Signature       Oct. 22, 2012
                       Date
NOTARY CERTIFICATION


Decision and Award: DPR No. 12-0056-A
Page 40 of 40